IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

DAN RYAN BUILDERS, INC.,
a Maryland Corporation,

        Plaintiff,

v.                //   CIVIL ACTION NO. 1:09CV161
                        (Judge Keeley)

CRYSTAL RIDGE DEVELOPMENT,
INC., ET AL.,

        Defendants.

MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW GRANTING
JUDGMENT IN PART TO DAN RYAN BUILDERS, INC. ON ITS
CONTRACT CLAIMS, DENYING PLAINTIFF DAN RYAN BUILDERS,
INC.'S NEGLIGENCE CLAIMS AND DENYING AS MOOT DEFENDANT
LANG BROTHERS, INC.'S CLAIM IN CONTRIBUTION AGAINST
THIRD PARTY DEFENDANT HORNER BROTHERS ENGINEERS

I. PROCEDURAL HISTORY

The plaintiff, Dan Ryan Builders, Inc. ("DRB"), asserts two causes of action against the defendants, Crystal Ridge Development, Inc., Lang Brothers, Inc., or Robert S. Lang (collectively "LBI"): breach of contract and negligence.[1] (Dkt. No. 35). LBI, in turn, alleges a single cause of action for contribution against the third-party defendant Hornor Brothers Engineers ("HBE"). (Dkt. No. 73).[2]  This matter came on for a bench trial commencing August 20,

_____

[1] DRB abandoned its third claim, fraudulent misrepresentation, during the trial. (Trial Tr. 1657:10-11).

[2]  LBI originally asserted three causes of action against HBE: (1) implied indemnity; (2) contribution; and (3) breach of contract. (Dkt. No. 73). Prior to trial, DRB withdrew its implied indemnity claim against HBE. (Dkt. No. 233). To the extent that DRB

DAN RYAN BUILDERS, INC. v. CRYSTAL RIDGE DEV., ET AL    1:09CV161

MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW

2012 and concluding on August 24, 2012. The Court now issues its findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52.

## II. FACTUAL BACKGROUND[3]

### A. PRE-CONSTRUCTION PHASE

The Crystal Ridge housing development began as an unimproved 70 acre parcel of farmland in Bridgeport, Harrison County, West Virginia, that had been owned by the Lang family since the 1960s. (Trial Tr. 713:15-16). This raw land was situated directly across Route 50 from the family-owned construction business known as Lang Brothers, Inc. ("LBI"). Id. at 715:25 - 716:2. As an experienced earth-moving and sitework contractor, LBI had completed many large construction projects around the state and region. Id. at 939:13-18.

After witnessing significant growth in the Bridgeport area, at some point in 2004, Robert S. Lang ("Lang") began discussing the

---

maintained its breach of contract claim throughout trial, that claim has since been abandoned. DRB did not mention any such claim in its briefs, and, as HBE points out, the Court's post-trial rulings eliminated any claim for damages pursuant to the breach of contract count. (Dkt. No. 258 at 2-3).

[3] This subsection contains a general overview of the Court's factual findings under Fed. R. Civ. P. 52(a). More specific factual findings are included within the analysis of each individual claim.

DAN RYAN BUILDERS, INC. v. CRYSTAL RIDGE DEV., ET AL    1:09CV161

MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW

idea of developing the property with other family members. Id. at 713:16-22. He then engaged a company named Maple Creations from Charleston, West Virginia, to procure a marketing study in order to determine the best possible use of the property. Id. at 713:22 - 714:3. After Maple Creations informed Lang that the area was in need of single-family residences, following some very preliminary sketches, the Crystal Ridge housing development was conceived. Id. at 714:17-25.

In an effort to move forward with the Crystal Ridge concept, Lang turned to his long-time college friend, Paul "Trey" Hornor, president of Hornor Brothers Engineers ("HBE"). Id. at 1019:21 - 1020:3. Lang and Hornor had been students together at West Virginia University in the engineering program, and both had graduated with degrees in civil engineering in 1982. Id. at 709:22-24, 1019:13-20. As part of the initial marketing analysis for Crystal Ridge, Lang contracted with HBE on an hourly basis to prepare preliminary conceptual drawings of the subdivision. Id. at 715:1-19. Those drawings were then incorporated into Maple Creations' marketing plans, which Lang then used to solicit home builders with whom he could contract to sell the finished lots. Id. at 715:1 - 716:15.

DAN RYAN BUILDERS, INC. v. CRYSTAL RIDGE DEV., ET AL    1:09CV161

MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW

Among those home builders was Dan Ryan Builders, Inc. ("DRB") of Maryland. Id. at 716:11-17. After an initial display of disinterest in the project, DRB contacted Lang in early 2005 to express a change of heart. Id. at 716:20-25. Consequently, the two parties met at DRB's Hagerstown, Maryland, offices to discuss the project. Id. at 719:19-25. Based on positive developments during that meeting, they agreed to meet at the Crystal Ridge site on May 4, 2005. Id. at 721:20-25.

During this same time period, Lang contacted HBE about obtaining the required governmental approvals for the site development. Following discussions, Lang and HBE settled on a plan to subdivide Lang's seventy acre parcel into approximately 130 individual building lots of one-third to one-half acre each. (J. Ex. 6 at 1). HBE then prepared a written proposal, dated April 22, 2005, that offered to provide LBI with the necessary infrastructure engineering for the project. The proposal included five tasks:

(1)  To prepare plat and plan view drawings showing the lot and infrastructure layout;
(2)  To provide construction plans and specifications for the infrastructure;
(3)  To prepare application for water and sanitary sewer service to the WV Dept. of Health, as well as plans and specifications for the infrastructure systems for submittal to the City of Bridgeport or Harrison County Planning Commission;

4

DAN RYAN BUILDERS, INC. v. CRYSTAL RIDGE DEV., ET AL    1:09CV161

MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW

   (4) To submit application for an NPDES permit along
     with plans for sediment and erosion control to the
     WV Dept. of Environmental Protection; and
   (5) To provide three sets of construction plans and
     specifications along with final subdivision plat.

Id. The proposal also contained a list of items that were not

included in the agreement. Significantly, among those specific

exclusions were "[t]he preparation of individual plats for the sale

of lots" and "[g]eotechnical analysis or subsurface investigation."

Id. at 2.

  On May 4, 2005, two significant meetings occurred. Lang first

met with Trey Hornor and Tom Carothers[4] ("Carothers") from HBE, Tom

Brown[5] ("Brown") and Randy Spellman[6] ("Spellman") from the City of

Bridgeport, and Dan Minney[7] ("Minney") from LBI (LBI Ex. 6 at 1) to

address several issues pertinent to the site development at Crystal

---

  [4] Tom Carothers is a project manager for HBE. He is a licensed
Professional Engineer in the state of West Virginia and handled
most of the actual engineering work and day-to-day contact
regarding the Crystal Ridge site.

  [5] Tom Brown was the City Engineer for the City of Bridgeport.

  [6] Tom Spellman was the Director of Public Works for the City
of Bridgeport.

  [7] Dan Minney was employed by LBI as the project manager for
the Crystal Ridge project. Minney's background is in cost
accountant, with no formal construction management training. (Trial
Tr. 606:22 – 607:6).

DAN RYAN BUILDERS, INC. v. CRYSTAL RIDGE DEV., ET AL   1:09CV161

### MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
### FINDINGS OF FACT AND CONCLUSIONS OF LAW

Ridge. Rather than accepting the open drainage ditch system proposed by Lang, Brown and Spellman advised Lang that the City of Bridgeport would require that concrete curbs and inlets be installed for stormwater runoff. They also advised him that the City would require that the sewer line be placed in a utility bench cut into the hillside running parallel to Route 50. This bench would also serve as a drainage ditch in order to prevent runoff from reaching Route 50. Id. at 2. All parties in attendance agreed with this good concept, and Trey Hornor confirmed its viability following a site visit later that day. Id.

Lang next met with representatives from DRB. Following a tour of several other housing developments in the Morgantown and Clarksburg areas, the group met at the Crystal Ridge site (Trial Tr. 722:2 – 723:3), where they negotiated informally and settled on a flat price of $30,000[8] per finished lot. Believing that he had a valid oral agreement with DRB, id. at 723:12-24, 727:16 – 728:5, Lang then signed the April 22nd proposal from HBE and directed it

---

[8] Because all the lots had varying values depending upon their location and views, a flat rate of $30,000 was agreed upon regardless of the individual intrinsic values of any particular lot. The phrase that several parties recalled being used was "the good, the bad, and the ugly." (Trial Tr. 723:21-22).

DAN RYAN BUILDERS, INC. v. CRYSTAL RIDGE DEV., ET AL   1:09CV161

MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW

to proceed with the proposed engineering services. Id. at 728:13 - 729:14.

Later, Lang and DRB memorialized their oral agreement in a written "Lot Purchase Agreement" ("the LPA"), dated June 30, 2005, which DRB drafted, executed and sent on to Lang.(J. Ex. 1). The LPA laid out terms under which DRB would purchase as many as 143 single-family lots from CRD. Id. at 2. Under the LPA, both parties anticipated that the purchase of completed lots would proceed in phases. In Phase I, DRB expected to purchase a total of fifty lots, beginning with an initial purchase of twelve lots, followed by subsequent purchases of six lots per quarter. (Dkt. No. 232 at 5). This schedule, however, was never met.

Prior to signing the LPA, Lang filed an application with the State of West Virginia to form Crystal Ridge Development, Inc. ("CRD"). (LBI Ex. 7). After he signed the LPA on June 30, 2005, Lang transferred approximately twenty-eight acres of his family's original seventy (70) acre parcel to CRD to begin development. This subdivided parcel became known as the Crystal Ridge Subdivision, Phase I. (J. Ex. 11). The City of Bridgeport later annexed the entire parcel of land included in the Crystal Ridge development on May 15, 2006. (Dkt. No. 232 at 5).

7

DAN RYAN BUILDERS, INC. v. CRYSTAL RIDGE DEV., ET AL    1:09CV161

MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW

The LPA included a requirement that Lang turn over to DRB any geotechnical reports in his possession. Lang had none, and DRB never requested that he obtain one. (Trial Tr. 210:12-15, 204:24 - 205:8). The LPA also contained a "Seller/Buyer Responsibility Schedule," which outlined the parties' responsibilities for the project. (J. Ex. 1 at 20). This schedule contained a section labeled "I. Designs and Plans" that included "Mass Grading Plans" and "Lot Grading Plans." The "Mass Grading Plans" were the responsibility of CRD, while the "Lot Grading Plans" were DRB's responsibility. It is undisputed that CRD never prepared any "Mass Grading Plans."

Another section of the schedule, "V. Development," required CRD to provide "On-lot Fill Compaction and Engineer's Certification of Such Fill (if placed on Lots during road construction)." Id. at 23. Finally, the LPA contained forms labeled "Certificate of Readiness" and "Lot Inspection Report" that were to be signed by both parties after each lot's development but before DRB took possession of the lot. In actuality, however, CRD never completed the reports and DRB never demanded them. (Dkt. No. 232 at 12-13).

Meanwhile, pursuant to its engineering agreement with Lang, HBE prepared the documentation and applications necessary for CRD

8

DAN RYAN BUILDERS, INC. v. CRYSTAL RIDGE DEV., ET AL    1:09CV161

**MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S**
**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

to obtain the governmental approvals required to begin the development. Among these were:

    (1)   the "Water Distribution and Sanitary Sewer Plans," dated October 2005, (J. Ex. 12);

    (2)   the "Infrastructure Plans," dated February 2006, (J. Ex. 13);

    (3)   the "Preliminary Plat," dated March 2006, (J. Ex. 10); and

    (4)   the "Final Plat," dated May 2006, (J. Ex. 11).

Additionally, HBE prepared and submitted a "Site Registration Application and Drainage & Sediment Control Plan" ("the NPDES Plan"), dated September 16, 2005, to the State Department of Environmental Protection ("DEP") for the purpose of procuring the required NPDES permit. (J. Ex. 7). Notably, the NPDES plan included a soils report from the U.S. Department of Agriculture, Soil Conservation Service, id. at 47, disclosing the presence of several types of colluvial[9] soils that posed potential difficulties for the

---

    [9] See J. Ex. 18 at 4. Pennsylvania Soil & Rock report defining colluvium as "soil that has migrated or has been displaced downslope due to gravity and/or trapped water. The colluvium [here] generally consists of soft to stiff, moist clay with varying amounts of randomly oriented weathered rock fragments;" see also, "Colluvium is a type of parent material that moved down slope due to gravitational forces (in some cases water may play a role in initiation of the movement). Colluvium is heterogeneous, unsorted material of all particle sizes (from boulders to clay) with relatively little abrasion to round the particles. Consequently, colluvium consists of very sharp, angular rock fragments accumulated at the base of steep slopes." (http://soilweb.landfood.ubc.ca/landscape/parent-material/colluvi

DAN RYAN BUILDERS, INC. v. CRYSTAL RIDGE DEV., ET AL    1:09CV161

MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW

construction of dwellings, including issues with shrinkage and swelling, slopes and slippage. Id. at 47-53. All of these submissions and applications were eventually approved by the DEP.[10]

B.   CONSTRUCTION PHASE

Some time after October 2005, as HBE was obtaining documents and necessary approvals, LBI began to develop the site. (Trial Tr. 746:17-22). Starting at the entrance to Crystal Ridge from Route 50, it began construction of the infrastructure of the site, including the utility bench/drainage ditch running parallel to Route 50, the erosion and sediment control systems, and two sediment basins. Id. at 749:12-24. Using the infrastructure plans provided by HBE, LBI also began to "cut-in" Emerald Drive, the main entry road for Crystal Ridge. Id. at 753:17 - 754:12. Simultaneously, LBI laid the other required components of the infrastructure alongside the roadway as it progressed, including the buried gas, electric, phone and cable lines. Id. at 748:3-7, 754:23-25. Finally, prior to being able to turn over any lots for purchase by DRB, LBI needed to install the curbing and gutters,

_____

al-environment) (last visited July 7, 2013).

    [10] Later, there were changes to the NPDES plan which required further review and approval. These are discussed in depth under section "D. Miscellaneous," infra.

DAN RYAN BUILDERS, INC. v. CRYSTAL RIDGE DEV., ET AL    1:09CV161

MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW

along with a base course of asphalt, on Emerald Drive. Id. at 750:3-8.

1.    FILL SLOPE CONTRACT

Sometime after February 2006, during construction of the infrastructure, Lang and DRB's site manager, Dave Warrenfeltz ("Warrenfeltz"), began discussing the need for grading on certain lots in order to accommodate houses. Id. at 771:7-15. Included in this required work was the construction of a significant "fill slope" on Lots One through Nine.

HBE prepared cross sections of these lots, labeled "Volume Computations," and dated 3/13/06.[11]  It is uncontested that these were not engineered construction plans and specifications for grading and drainage of the fill and cut slopes.  According to John Horner of HBE, DRB had requested the cross sections. (Trial Tr. 1470:2-4).  Although Chris Rusch ("Rusch"), President of DRB's Morgantown Division, testified that he was unsure as to whether Lang or DRB had requested them, id. at 184:12-20, he admitted that DRB had paid HBE for the drawings. Id. at 184:14-15. DRB provided

_____

[11] There was conflicting testimony at trial as to whether the drawings initially received by DRB contained the cover sheet labeling the drawings as volume computations and containing the date. However, the joint exhibit included the cover sheet. (J. Ex. 15).

DAN RYAN BUILDERS, INC. v. CRYSTAL RIDGE DEV., ET AL    1:09CV161

MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW

these cross sections to LBI, which LBI used to calculate a price for the lot grading. Id. at 772:2 - 773:8.

Importantly, both HBE and LBI have acknowledged that these rudimentary drawings were only intended to be used to calculate the volume of earth LBI would need to move so that the parties could agree on a price for the construction of the fill slope. They were never intended to be used as engineered construction plans and specifications for a fill slope on Lots One through Nine. They contained no engineering seal, id. at 1475:11-12; they also contained no disclaimer advising against their use in lieu of engineered construction plans and specifications. Ultimately, Lang admitted at trial that, as an experienced civil engineer and contractor, he knew these cross sections were not the equivalent of engineered plans, but as they were the only drawings LBI had received from DRB, he used them to construct the fill slope. Id. at 780:10-11; 1007:6-9; 1036:15-18; 1037:18.

Based upon the volumes computed using the cross sections prepared by HBE, LBI and DRB entered into a "Contract With Independent Contractor" (the "Fill Slope Contract") in April 2006. (J. Ex. 4). Under this contract, LBI was to "provide the cut and fill necessary to deliver finished buildable lots as described in

12

DAN RYAN BUILDERS, INC. v. CRYSTAL RIDGE DEV., ET AL    1:09CV161

MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW

the mass grading cross sections provided by Hornor Brothers Engineers"[12] for Lots One through Nine and Nineteen through Twenty-Six. In return for this work, DRB paid LBI $100,000. Id. at 1.

Although the Fill Slope Contract required LBI to provide DRB with compaction reports performed by an independent contractor, id., no compaction tests were ever performed[13] and DRB never demanded them. (Trial Tr. 763:22 - 767:8). While there is a

---

[12] "Cut and fill" is a standard practice whereby earth is removed from the higher parts of a site and placed in the lower parts of the site as needed. For example, the original infrastructure plans contain cut and fill calculations for the construction of Emerald Drive.

[13]Although evidence of compaction tests performed by Thrasher Engineering was presented at trial, these tests were for fill that was placed for the roadway, adjacent fill placed near the edges of certain lots as a necessity of the road construction, sediment ponds, or other infrastructure. Additionally, there are some test results for compaction tests under footings during construction of the house on Lot Four (not for the underlying fill slope). No actual evidence was ever presented that tests were performed during, or specifically for, the fill slope, including any tests whatsoever on Lot Seven. A fill slope of that size, with lifts of between six and twelve inches, would need a significant amount of compaction testing as each lift of soil was placed and compacted. (Trial Tr. 675:19-21, 678:7-9, 764:20-21); see, e.g., http://www.fairfaxcounty.gov /dpwes/publications/pfm/chapter4.pdf (last visited Aug. 8, 2013) (Fairfax Cty., VA., government website suggesting that fill slopes have at least one compaction test for every 5,000 sq. ft. of fill in *every* six inch lift. Thus, for instance, an eighteen foot deep fill slope of up to 5,000 sq. ft. would require at least thirty-six tests using this standard).

13

DAN RYAN BUILDERS, INC. v. CRYSTAL RIDGE DEV., ET AL     1:09CV161

MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW

significant dispute in this case about whether LBI properly
constructed the fill slope, there is no dispute that LBI completed
the grading work and was paid in full by DRB. (Trial Tr. 760:7-12).

Pursuant to the terms of the LPA, following construction of
the first fill slope and installation of the necessary
infrastructure, DRB purchased the first twelve lots on August 4,
2006`. That initial purchase covered Lots One through Seven and
Twenty through Twenty-four. (Dkt. No. 232 at 6).

2. TRADE CONTRACT AND SECOND FILL SLOPE CONTRACT

In June 2006, during the fill slope construction but prior to
DRB's initial lot purchase, LBI and DRB entered into another
contract, the so-called "Trade Contract" (J. Ex. 2), under which
DRB could issue purchase orders pertaining to new homes on specific
lots. This required LBI to perform certain grading work on the
lots, including excavation for foundations, as well as foundation
damproofing and backfilling. Id. at "Exhibit C".

In October 2006, LBI and DRB entered into a second "Contract
With Independent Contractor" (the "Second Fill Slope Contract"),
the details of which were similar to those in the first Fill Slope
Contract. This contract called for LBI to provide fill for Lots Ten
through Fourteen. (J. Ex. 5). No cut was required for these lots,

14

DAN RYAN BUILDERS, INC. v. CRYSTAL RIDGE DEV., ET AL    1:09CV161

### MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S FINDINGS OF FACT AND CONCLUSIONS OF LAW

however, because all were situated on the downhill side of Emerald Drive. The contract also contained the same compaction testing requirement provided for in the first Fill Slope Contract. Once again, however, no such testing ever occurred. LBI completed the fill work and was paid in full by DRB. (Trial Tr. 760:7-12).

Following the completion of the Second Fill Slope Contract and installation of the infrastructure necessary to service these lots, DRB made a second purchase of five lots. That purchase occurred on January 8, 2007, and covered Lots Eight through Ten, Eighteen, and Nineteen. (Trial Tr. 88:21-89:3).

After it completed construction of the two fill slopes, LBI continued to construct the infrastructure for Crystal Ridge throughout the remainder of 2006 and well into 2007. Simultaneously, it performed limited services on several finished lots, including Lots Five and Seven. This work was performed pursuant to the Trade Contract with DRB, and included excavation, damproofing and backfilling of new foundations.

### C. PROBLEMS BEGIN

### 1.   INITIAL SLIP OF THE FILL SLOPE - MARCH 2007

The first sign of trouble involving LBI's sitework at Crystal Ridge appeared in March 2007. (Dkt. No. 232 at 6-7). The house

15

DAN RYAN BUILDERS, INC. v. CRYSTAL RIDGE DEV., ET AL    1:09CV161

MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW

constructed on Lot Seven was substantially complete, and while the prospective homeowner was on site for a visit, he noticed some cracks in the basement concrete slab, (Trial Tr. 68:4-7), and immediately alerted DRB. Rusch, on behalf of DRB, personally inspected the home and the lot, and observed significant cracks in the basement slab and the foundation walls. Id. at 69:6-25. Upon further inspection, he also noted a tension crack in the soil at the rear of the yard. Id. at 70:7-15.

Concerned, Rusch contacted CTL Engineering ("CTL") of Morgantown, West Virginia, an engineering firm whose services DRB had used before, to investigate and analyze the situation. Id. at 71:1-6. CTL undertook a "subsurface investigation" of Lot Seven, which included obtaining five soil borings that were limited to the area around the foundation of the home. (Dkt. no. 232 at 6-7). As part of its investigation of the problems on Lot Seven, however, CTL failed to conduct a slope stability analysis or recommended that DRB obtain a geotechnical report. (Trial Tr. 1531:3-5).

CTL's "Subsurface Investigation Report" concluded that the damage to the foundation on Lot Seven was due to differential settlement of the fill material. To remediate the problem, it recommended that DRB remove the surcharge weight of the home from

16

DAN RYAN BUILDERS, INC. v. CRYSTAL RIDGE DEV., ET AL    1:09CV161

MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW

the fill soil and transfer the weight directly onto the bedrock below by installing steel helical piers from the foundation walls down into the bedrock. (Dkt. No. 232 at 6-7); (Trial Tr. 1533:5-14).

It also recommended that a process known as pressure grouting be performed under the concrete basement slab. Id. at 1533:16-20. CTL expected that this procedure, which injects cementitious material at high pressure, would fill any voids, lift the slab back into its proper position, and simultaneously compact the underlying fill. Id. at 1533:23 - 1534:2.

DRB accepted CTL's proposed remediation plan. It installed the helical piers in order to stabilize the house on Lot Seven.[14] (Dkt. No. 232 at 6-7).

DRB recalled CTL to the Crystal Ridge site several more times following the remediation of Lot Seven. In April 2007, it asked CTL to conduct testing on Lot Ten.[15] (Trial Tr. 1535:7-12). Due to the

---

[14] Ultimately, the contract for the sale of Lot Seven to the original prospective buyer was terminated as a result of the damage and necessary repairs. DRB subsequently secured a new purchaser for Lot Seven. (Dkt. No. 232 at 6-7).

[15] This request was in response to a site visit by a City of Bridgeport inspector on April 9, 2007, during which, the inspector noticed a seam of white clay in the soil during excavation. (Trial Tr. 1319:1-7). Because white clay is slip prone, the inspector

DAN RYAN BUILDERS, INC. v. CRYSTAL RIDGE DEV., ET AL    1:09CV161

MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW

soil conditions it encountered during that testing, CTL recommended that DRB construct a non-standard footing design. Id. at 1311:16-20. Again, however, it never recommended that DRB undertake a slope stability analysis or secure a geotechnical report. Nor did DRB ever request that either be done. Id. at 1536:6-15.

In May 2007, CTL performed fifteen test borings on additional lots being graded for home construction. (Dkt. No. 232 at 8); Trial Tr. 1537:11 - 1538:17). These borings, conducted on locations selected by DRB, were confined to the front and rear locations of the proposed foundations. (Trial Tr. 77:2-5; 1538:3-6). None, including the original five borings from Lot Seven, showed the presence of colluvial soil. Id. at 1539:9-12. CTL therefore determined that all of the inspected lots, with the exception of Lot Three, could achieve the required bearing capacity for standard construction.

Lot Three, in contrast, required significantly more excavation, a situation that ultimately led to the removal and reconstruction of the fill underlying the proposed house footprint.

_____

halted work on the site until CTL could analyze the conditions and propose a safe solution. Id. at 1320:5-12.

DAN RYAN BUILDERS, INC. v. CRYSTAL RIDGE DEV., ET AL    1:09CV161

MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW

DRB, however, never investigated the slope behind the house footprint. Id. at 77:2-14, 128:14-21.

In July 2007, CTL visited Crystal Ridge again, this time to inspect tension cracks and problems with deck footings on Lots Three and Seven. (Dkt. No. 232 at 8-9). Following that inspection, CTL recommended that DRB extend the deck footings down into the residual soils below the fill. (Trial Tr. 1541:13-19). Although it noted tension cracks, CTL never recommended that DRB undertake a slope stability analysis or obtain a geotechnical report. Nor did DRB ever request that either be done. Id. at 1541:25 - 1542:6.

### 2.   THE DIVORCE OF DRB AND LBI/AMENDED LPA

The problems with the various lots, together with the necessary remediation and its associated costs, exacerbated underlying financial difficulties that LBI was experiencing.[16] (Trial Tr. 83:14 - 84:3, 87:15 - 88:10, 836:2-16.) The lot

---

[16] LBI was having cash flow problems largely related to delays in selling down the lots to DRB. (Trial Tr. 87:15-22, 836:3-16). Also, it had procured a construction loan for the infrastructure of Crystal Ridge, intending to service it using the proceeds of lot sales to DRB. That debt service was strained by the project's delays and cash flow problems, however. Id. at 622:33 - 624:7. Additionally, taxes owed to the City of Bridgeport were in arrears and several suppliers either had refused to deliver materials or had placed liens on the property for non-payment. Id. at 109:6 - 111:7.

DAN RYAN BUILDERS, INC. v. CRYSTAL RIDGE DEV., ET AL    1:09CV161

MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW

purchasing schedule originally outlined in the LPA was behind
schedule, and DRB was exerting pressure on LBI to finish more
buildable lots. Id. at 84:4-20. This pressure, coupled with LBI's
cash flow problems and workflow issues, led to discussions about a
"divorce" between LBI and DRB. Id. at 85:1 - 88:4, 98:9 - 99:18.
While it is not clear who initiated these discussions, it is
undisputed that the parties ultimately agreed that a "divorce"
would be the most beneficial way to move the project forward.

The parties' "divorce" agreement was memorialized in a "First
Amendment to Lot Purchase Agreement" ("First Amendment"), dated
May 7, 2007. (J. Ex. 3). Pursuant to this agreement, DRB agreed to
purchase the remaining thirty-three lots of Crystal Ridge Phase I
from LBI for various prices, depending upon each lot's condition
and status. Id. at 2. DRB, rather than LBI, would then finish the
required infrastructure construction in return for a credit against
the purchase price at closing. Id.

**3.   FURTHER PROBLEMS DEVELOP**

While the First Amendment effectively ended the working
relationship between DRB and LBI,[17] it did not end DRB's problems

---

[17] Although the working relationship moving forward ended, LBI
still retained certain responsibilities for repairs of previous
infrastructure work and final paving of Emerald Drive, for which it

DAN RYAN BUILDERS, INC. v. CRYSTAL RIDGE DEV., ET AL   1:09CV161

MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW

with the Crystal Ridge project. In mid-December 2007, the fill slope behind Lot Seven began sliding down toward Route 50. (Dkt. No. 232 at 9-10). This earth movement dropped the ground behind Lot Seven approximately three feet, exposing the home's footings. (Trial Tr. 133:1-3). The home's rear deck was leaning one to two feet and pulling away from the rear wall. Id. at 133:4-5. After being summoned to the site, Rusch assessed the situation, informed the City of Bridgeport about the problem, and asked the new homeowner to evacuate the dwelling. Id. at 133:7-13, 135:13.

Now fully engaged and concerned about the slope's overall stability, Rusch reached out to several engineering firms for assistance. Id. at 135:15. First, he called CTL on December 20, 2007, and requested that it come to the site for the specific purpose of assessing the structural integrity of the house on Lot Seven. (Trial Tr. 1542:7-20). CTL concluded that the home was structurally stable at that time and recommended a "below grade cast-in-place soldier pile wall system"[18] to prevent further slope

had secured bonding from the City of Bridgeport. These responsibilities were outlined by the parties and acknowledged by Lang in a signed letter of May 17, 2007, DRB Ex. 1, which is discussed under section D.3., *infra*.

[18] Soldier pile retaining wall systems generally consist of piles, usually steel or concrete (in this case a concrete cast-in-

DAN RYAN BUILDERS, INC. v. CRYSTAL RIDGE DEV., ET AL   1:09CV161

MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW

slippage. Id. at 1543:6 - 1544:15; (HBE. Ex. 32). While DRB did remove the deck from the home, it never constructed the soldier pile wall system recommended by CTL. (Trial Tr. 255:14-22).

Next, in mid-January 2008, DRB engaged Alpha Engineering ("Alpha") to walk the entire site and evaluate concerns that other homes might be affected by the slide and require evacuation. Id. at 136:9-12. Alpha recommended extending the gutter downspouts on all houses "at effected [sic] slopes" down to the bottom of the slope, in order to alleviate saturation of the slope. (Dkt. No. 232 at 10). Additionally, Alpha concluded that slope movement had rendered the home on Lot Seven uninhabitable and recommended that the structure be razed. Id. at 9-10. Pursuant to this recommendation, DRB repurchased the home on Lot Seven and razed the structure in mid-February 2008. (Trial Tr. 137:7-10, 541:1-5).

After observing ground movement and widespread tension cracks on several other lots, Alpha also recommended that DRB undertake a geotechnical study and remediation of the slope. Id. at 137:11-14.

---

place pier), being driven into or built upon the rock strata at specific spacing intervals. Between those piles the soil is excavated one section at a time. Horizontal "lagging," usually wood or concrete, is then placed between the piers forming a wall. Finally, soil is backfilled around this newly built wall. (see, e.g., http://www.deepexcavation.com/en/retaining-systems-soldierpile) (last visited July 17, 2013).

DAN RYAN BUILDERS, INC. v. CRYSTAL RIDGE DEV., ET AL    1:09CV161

MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW

As a result, DRB engaged Pennsylvania Soil & Rock Inc. ("PSR")[19] to perform a geotechnical analysis of the fill slope. (J. Ex. 18). When PSR undertook this analysis in March 2008, it conducted an extensive site investigation, including taking twenty-two test borings. Id. at 4. These borings revealed that the fill slope behind Lots Two through Seven had failed and was sliding down the embankment. (Dkt. No. 232 at 10). PSR recommended supporting the existing homes on those lots with helical piers, followed by a complete slope reconstruction. (Trial Tr. 142:17-25); (Dkt. No. 232 at 10).

PSR's report identified two main factors contributing to the slope failure. First, due to its natural composition and soil type, the existing, underlying slope was only marginally stable. (J. Ex. 18 at 8). Second, the fill slope placed by LBI on top of the pre-existing slope had been poorly constructed, creating an unstable fill embankment. In addition, the instability caused by both of these factors was exacerbated by the presence of significant soil saturation. Id. Referencing the poor construction practices involved in LBI's slope construction, PSR specifically noted over-

---

[19] DRB did request and received opinions from another engineering firm which confirmed PSR's evaluation. That firm had no further involvement with the project. (Trial Tr. 143:3-10).

DAN RYAN BUILDERS, INC. v. CRYSTAL RIDGE DEV., ET AL    1:09CV161

MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW

steepened slope faces,[20] lack of proper keyways, inadequate drainage, lack of proper benching, and uncontrolled fill placement and compaction as contributing factors. Id.

**4.   REMEDIATION OF THE FILL SLOPE**

After receiving PSR's report, DRB engaged it to design and supervise a complete remediation of the fill slope. This remediation effort began with the removal of the slide materials and some of the native soils. (Trial Tr. 378:6 - 379:9). That removal was followed by construction of a toe keyway down to the bedrock and reconstruction of the slope using proper benching, adequate drainage, and properly compacted fill soil. Id. at 379:8 - 380:12. Finally, PSR directed the installation of a significant quantity of rock on and within portions of the slopes to create a slope requiring minimal compaction, while still allowing for proper drainage. Id. at 380:23 - 381:17. This proved to be the most

---

[20]  All the experts at trial consistently testified that a proper fill slope, in these soil conditions, should be no steeper than a one foot vertical rise for every two feet of horizontal run ("2H:1V"). (Trial Tr. 326:10-12, 358:24 - 359:4, 450:7-10, 1581:5-7) (the closer to equal, i.e., 1H to 1V, the steeper the slope; the more unequal, i.e. 2H or 3H to 1V, the flatter the slope). Indeed, nowhere in any of the various HBE documents, any other drawings, plans, or specifications, is a slope steeper than 2H:1V shown. Multiple testimonials stated that several sections of the finished fill slope were approximately 1.5H:1V or 1.75H:1V - steeper than the acceptable limit of 2H:1V. (Trial Tr. 356:20 - 358:23).

DAN RYAN BUILDERS, INC. v. CRYSTAL RIDGE DEV., ET AL     1:09CV161

MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW

feasible remediation process because the presence of houses on the site significantly limited access by large machinery. Id. at 381:2-14.

Notably, the new design did not incorporate a utility bench into the new fill slope. Id. at 382:11. Rather, PSR buried the utilities in the new fill slope which, as redesigned, ran uninterrupted from the base of Route 50 to the crest of the slope at the rear yards, thus making the slope flatter. Id. at 383:1 – 384:1. At trial, PSR's expert testified that there was no reason the slope could not have been built this way from the beginning. Id. at 381:18-20.

### D. MISCELLANEOUS ISSUES

In addition to its fill slope problems, DRB encountered problems related to the stormwater management system and NPDES permit. It also learned that the entrance to Crystal Ridge, located at the base of Emerald Drive, was actually situated on property belonging to a neighbor. Finally, DRB concluded that LBI's substandard construction of portions of the infrastructure required significant repairs and replacement.

DAN RYAN BUILDERS, INC. v. CRYSTAL RIDGE DEV., ET AL   1:09CV161

MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW

1.   NPDES PERMIT AND STORMWATER MANAGEMENT SYSTEM ISSUES

The First Amendment required that the NPDES permit be transferred from LBI to DRB. This permit transfer triggered a site inspection of the stormwater management and sediment control systems by the DEP in October 2007. (Trial Tr. 113:12-22). As a result of that site inspection, the DEP determined that the actual physical construction done on site had not been accurately reflected in the plans submitted as part of the NPDES application. (DRB Ex. 14). Some of the discrepancies between the NPDES Plan and the actual as-built conditions resulted from the change over from the ditch type drainage designed by HBE to the gutter and curb type drainage required by the City of Bridgeport. (Trial Tr. 952:17 - 953:3). Nevertheless, due to these various discrepancies, the DEP issued two "Notices of Violation" to Lang. Id. at 290:16-19.

In December of 2007, DRB contracted with Thrasher Engineering ("Thrasher") to bring the site into compliance and to cure the defects underlying the violations. Id. at 115:14-23. Thrasher's review of the DEP documents disclosed four main concerns with the stormwater management and sediment control systems at Crystal Ridge. Id. at 265:19 - 266:9. These included:

26

DAN RYAN BUILDERS, INC. v. CRYSTAL RIDGE DEV., ET AL    1:09CV161

MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW

(1) Sediment basin number 2 was full of sediment, not
    releasing  water, and the riser was not working
    properly;
(2) The quantity of water running into sediment basin
    number two and whether the basin was adequately
    sized;
(3) Lack of collection devices to prevent plumes of
    sediment laden water from running down Emerald
    Drive and entering state waters; and
(4) General sediment trap concerns.

Id. at 265:19 - 266:9; (DRB Ex. 14). After reviewing these concerns

and conducting a site inspection, Thrasher prepared a revised plan

for submission to the DEP. (Trial Tr. 271:22-25; DRB Ex. 19). Among

the revisions included in Thrasher's plan were three additional

sediment traps, sediment removal from existing traps, additional

sediment control devices,[21] and, most significantly, the cleaning

and enlargement of Sediment Basin Two. (DRB Ex. 19).

HBE's original NPDES Plan had included two basins, Basin

Number One, which was across Route 50 on LBI's business property,

and Basin Number Two, situated on the Crystal Ridge property

towards the base of Emerald Drive. (J. Ex. 12). The plan split the

stormwater run-off between the two basins with a direct feed into

Basin Two and a culvert running under Route 50 to feed Basin One.

_____

[21] These sediment control devices included slit fencing, inlet
protection, riprap (stone, rock, or cement fragments placed to
prevent scour or erosion), and various ditches. (Trial Tr. 271:9-
19).

27

DAN RYAN BUILDERS, INC. v. CRYSTAL RIDGE DEV., ET AL    1:09CV161

MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW

Id. However, largely because DRB and LBI had completed their "divorce" at the time it was contracted to remedy the DEP violations, Thrasher did not consider using Basin Number One as it was located on LBI's property. Instead, it determined to enlarge and rely solely on Basin Number Two. This decision was based in large part on concerns about lack of future access to or control of a sediment basin that would not be located on DRB's property. Id. at 284:13-25, 288:15-17.

Following several discussions and further revisions, the DEP eventually accepted Thrasher's new plans, including the additional sediment control devices and the consolidation of stormwater runoff using only one sediment pond. Id. at 282:1-12, 283:5-9. DRB implemented Thrasher's plan, and completed the required additions and alterations to the SWM/SCS, which brought the site back into compliance with the DEP. Id. at 115:22-23. Notably, as part of the instant lawsuit, DRB is seeking to recover damages related to its decision to enlarge Basin Number Two, which, as revised and constructed, encroached upon Lot One, rendering that lot unbuildable for DRB's original intended purpose. Id. at 557:8-13.

28

DAN RYAN BUILDERS, INC. v. CRYSTAL RIDGE DEV., ET AL     1:09CV161

MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW

### 2.   EMERALD DRIVE ENTRANCE EASEMENT

Sometime in mid-2009, DRB became aware of an ownership issue surrounding the entrance to the Crystal Ridge development. Id. at 534:2-11. A neighbor of Crystal Ridge, Kevin Wilfong ("Wilfong"), approached DRB to advise that it had constructed the entrance to Crystal Ridge on his property, titled in the name of Middletown Home Sales, Inc. Id. at 534:4-11. Although DRB admitted it had seen plans showing that the entranceway crossed Wilfong's property, it claimed that it had the impression an easement had been granted. Id. at 534:18 - 535:9. Ultimately, DRB was forced to purchase the land on which the entranceway was situated for $35,000, and also to perform some improvements on Wilfong's property. Id. at 536:3-10.

### 3.   SUBSTANDARD INFRASTRUCTURE WORK

DRB has asserted that several areas of the infrastructure constructed by LBI were deficient. First, it has claimed that LBI failed to install the final "wearing course" of asphalt on Emerald Drive,[22] which was work required under both the original LPA and

---

[22] The final wearing course of asphalt is the top surface and is placed after the general construction is complete. This is done in order to minimize damage to the final road surface while construction continues. Usually, the contractor responsible for placing this final coating is required to provide security (a bond or letter of credit) to the municipality or controlling authority to ensure that the work is completed in a satisfactory manner. In

DAN RYAN BUILDERS, INC. v. CRYSTAL RIDGE DEV., ET AL    1:09CV161

MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW

also the First Amendment. (J. Ex. 3 at 5). Regarding this, during his testimony at trial, Lang admitted that the final wearing course had eventually been installed, but at DRB's expense. (Trial Tr. 561:7-15, 844:10-13).

Second, the First Amendment required LBI to complete any repairs to its work on the roadway and curbing of Emerald Drive directed by the City of Bridgeport. (J. Ex. 3 at 5). It also provided that the parties would meet and review the required repairs, which then would be completed within sixty days. Id. The results of that site inspection were acknowledged by the parties in a signed acknowledgment. (DRB Ex. 1).

At trial, Lang admitted that, although he knew these repairs were LBI's responsibility, he never performed the work because DRB had built and was using multiple "turn-arounds" on property that still belonged to him and his family. (Trial Tr. 847:5 - 848:14). In his opinion, that encroachment neutralized any repair obligations LBI might owe to DRB. Id. at 591:12 - 592:19, 844:14 - 845:3.

─────────────────

the instant case, LBI provided the required security to the City of Bridgeport. (Trial Tr. 843:12-15, 847:3-4).

DAN RYAN BUILDERS, INC. v. CRYSTAL RIDGE DEV., ET AL    1:09CV161

MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW

Finally, DRB has claimed damages arising from "utility issues, gas main, and miscellaneous bad work." Id. at 536:11-14. Among these, it has asserted that the City of Bridgeport required two 12" steel casings as part of the infrastructure, despite the fact that these were not shown on the approved plans. Id. at 537:13-18. Although this requirement was not evident to DRB until after its divorce from LBI, it insists LBI was aware of the requirement and failed to disclose it prior to signing the First Amendment. Id. at 550:13 - 552:5. The remaining utility, gas main, and other miscellaneous issues were ill-defined and ultimately not established by DRB at trial. (Dkt. No. 256 at 50). Thus, only the disputed 12" steel casings remain a viable issue under this "miscellaneous bad work" portion of possible infrastructure damages in this case.

### III. LEGAL ANALYSIS

#### A.   BREACH OF CONTRACT

DRB asserts four separate breach of contract claims against LBI that stem from the LPA and the First Amendment to the LPA. For the reasons that follow, the Court concludes that DRB has failed to meet its burden of proof as to all but one of these claims.

31

DAN RYAN BUILDERS, INC. v. CRYSTAL RIDGE DEV., ET AL    1:09CV161

MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW

### 1.    LEGAL STANDARD

In order to establish a breach of contract claim under West Virginia law, a plaintiff must prove four elements by a preponderance of the evidence: (1) the existence of a valid, enforceable contract; (2) that the plaintiff has performed under the contract; (3) that the defendant has breached or violated its duties or obligations under the contract; and (4) that the plaintiff has been injured as a result. Kanawha–Gauley Coal & Coke Co. v. Pittston Minerals Group, Inc., No. 5:12–4609, 2011 WL 3022239, at * 10 (S.D. W. Va. July 22, 2011) (citing Exec. Risk, Inc. v. Charleston Area Med. Ctr. Inc., 681 F. Supp. 2d 694, 714 (S.D. W. Va. 2009)).

"It is a fundamental principle of the law of contracts that a plaintiff is only entitled to such damages as would put him in the same position as if the contract had been performed." Milner Hotels, Inc. v. Norfolk & W. Ry. Co., 822 F. Supp. 341, 344 (S.D.W. Va. 1993). Consequently, "[i]n an action for breach of contract to perform specified work, the measure of damages is the actual loss suffered by the injured party directly flowing from such breach." Syl., Horn v. Bowen, 67 S.E.2d 737 (W. Va. 1951). A plaintiff must demonstrate "not only the amount of its damages but also that the

DAN RYAN BUILDERS, INC. v. CRYSTAL RIDGE DEV., ET AL    1:09CV161

MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW

damages were proximately caused by the defendant's breach,"
Kanawha-Gauley, 2011 WL 3022239, at * 10, and such damages "cannot
be too remote, contingent or speculative, but must consist of
actual facts from which a reasonably accurate conclusion could be
drawn regarding the cause and amount of such damages." Exec. Risk
Inc., 681 F. Supp. 2d at 726.

　　2.　DISCUSSION

　　　DRB categorizes its breach of contract claims in terms of the
damages that it contends flow from the breach. These include: (1)
"repairs and final course of asphalt on Emerald Drive";
(2) "entrance easement"; (3) "stormwater management and erosion
control system"; and (4) "miscellaneous bad work," i.e., the "12"
steel casing required for infrastructure." (Dkt. No. 256 at 55-58).
The Court now turns to each of these categories in turn.

　　　　a.　Repairs and Final Course of Asphalt on Emerald
　　　　　　Drive

　　　DRB asserts that LBI breached Paragraph 10 of the First
Amendment to the LPA when it "neither completed the repairs
identified for nor the final wearing course of asphalt on Emerald
Drive." (Dkt. No. 256 at 56). DRB alleges that it "incurred
expenses in the amount of $220,432.09" when it completed these
activities at its own expense. Id.

33

DAN RYAN BUILDERS, INC. v. CRYSTAL RIDGE DEV., ET AL    1:09CV161

MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW

i.    Relevant Contractual Duties[23]

(a). The LPA

Pursuant to the terms of the original LPA executed on June 30, 2005, DRB, via two separate closings, purchased seventeen lots of the fifty-lot subdivision from LBI. (Trial Tr. 164:14-17; 173:2-4). Exhibit B to the original LPA, entitled "Development Obligations," sets forth the "terms and conditions" for "finish[ing] each of the Lots" to be settled upon at the various closings. (J. Ex. 1 at 14, 8). Under Section 1(D) of Exhibit B, LBI was responsible for:

> Construct[ing] and complet[ing] all infrastructure, including but not limited to **asphalt paved streets**, **curbs**, gutters (if any), sidewalks (if any), driveway aprons (if any), ditch lines, signs, and common area trees. The asphalt paved streets servicing the Lots to be settled upon shall be connected to existing public streets, all as required by the Plans. **Base course asphalt paving**, water and sewer shall be installed at settlement. Gas (if available), electric and telephone main lines shall be completed and all said utilities shall be available at settlement. **Final paving**, common area trees, and street lights shall be completed as and when required by [LBI's] bond therefor which shall be posted with the proper governmental authorities and so as not to hinder or delay the issuance of any building permit or use and occupancy permit for [DRB's] dwelling units. . . .

---

[23] In light of the extensive rights and obligations described in the LPA and the First Amendment to the LPA, the Court limits its findings of fact to the provisions that the parties have identified as relevant to each individual breach.

34

DAN RYAN BUILDERS, INC. v. CRYSTAL RIDGE DEV., ET AL    1:09CV161

MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW

Id. at 14-15 (emphasis added). Under Section 1(L) of that same Exhibit, LBI was also responsible for "[p]erform[ing] and complet[ing] all other off Lot and off Property site improvements and actions required by all appropriate governmental agencies." Id. at 16.

### (b). First Amendment to the LPA

The parties executed the First Amendment to the LPA on May 7, 2007, (J. Ex. 3 at 1), in order to, in the words of Rusch, "get[] [LBI] out of the way of the development." (Trial Tr. 85:2-3). Pursuant to that First Amendment, DRB agreed to purchase the thirty-three remaining lots of the subdivision, all but ten of which were unfinished, and complete "certain of the development responsibilities" listed in Section 8(b)(iv) of the LPA "as provided in this First Amendment." (J. Ex. 3 at 2).[24] LBI granted DRB a $162,000.00 credit against the purchase price of the thirty-three remaining lots in exchange for its promise to **complete** the development work listed in Section 8(b)(iv) [of the LPA] on Lots

---

[24]   DRB characterizes the First Amendment as a "buy-out" by which it agreed to "purchase the remaining 33 lots in Crystal Ridge and complete the development obligations on those lots and the remaining development obligations on any other lots." (Dkt. No. 256 at 43-44).

35

DAN RYAN BUILDERS, INC. v. CRYSTAL RIDGE DEV., ET AL    1:09CV161

MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW

1-27," i.e., the lots on which LBI had already performed work. Id. (emphasis added).

Importantly, Section 8(b)(iv) of the LPA cross-references Section 2 of Exhibit B, which, in turn, incorporates the majority of the "development obligations" listed in Section 1 of Exhibit B – including the infrastructure obligations contained in Section 1(D), "with the exception of final surface paving," and the "off Property" improvement obligations contained in Section 1(L). (J. Ex. 1 at 6, 15-16). In other words, DRB agreed to complete LBI's unfinished infrastructure work as to the "finished" lots – with the exception of final surface paving – and take over the development obligations for the unfinished lots.

Paragraph 10 of the First Amendment to the LPA, the provision that DRB alleges LBI breached, provides as follows:

> [LBI] and [DRB] agree that all letters of credit placed by [LBI] to guarantee the development of Phase 1 of the subdivision shall remain in [LBI's] name. At least five (5) days prior to Final Closing [i.e., no later than May 15, 2007], [LBI] and [DRB] together shall conduct an inspection of Phase I [i.e., Lots 1-50] of the Subdivision, using the checklist issued by the City of Bridgeport that specifies the requirements for Bond Release (the "Bridgeport Checklist"), **to identify all repairs that are the responsibility of [LBI]**. Within sixty (60) days of that inspection, **[LBI] shall have made all such repairs and shall have obtained written acceptance of those repairs by [DRB]**. After [DRB's] written acceptance, [DRB] shall be responsible for any

36

DAN RYAN BUILDERS, INC. v. CRYSTAL RIDGE DEV., ET AL    1:09CV161

MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW

> work required by the Bridgeport Checklist for release of
> [LBI's] letters of credit on Lots 1-50, as shown on the
> Final Plat, **except that [LBI] shall remain responsible
> for installing the final wearing course of pavement of
> asphalt on Emerald Drive. In the event [LBI] does not
> complete any repairs within sixty days of the inspection,
> [LBI] shall retain**, and [DRB] shall not assume,
> **responsibility for any work required by the Bridgeport
> Checklist for release of [LBI's] letters of credit on
> Lots 1-50.**

(J. Ex. 3 at 5) (emphasis added).

### ii.  The Acknowledgment

On May 9, 2007, the parties completed the inspection
contemplated by Paragraph 10 of the First Amendment to the LPA, at
which time they identified and photographed certain repairs to the
road and the curb that would be LBI's responsibility. (Pl. Ex. 1 at
1). On May 17, 2007, both DRB and LBI, through their respective
agents, executed an acknowledgment of these inspection results. Id.
That Acknowledgment provides:

> Attachment A to this Acknowledgment contains pictures of
> all damaged road and curb areas. Each picture is labeled
> with a description of the type and location of the
> damage. **All damage as of the date of this inspection (as
> determined by the City of Bridgeport) is the
> responsibility of [LBI].**
>
> **In total, approximately 3864 square feet of blacktop is
> needed.** [LBI] will use its best efforts to make repairs
> to the blacktop within sixty (60) days hereof. **[LBI] will
> not be responsible for damage which occurs subsequent to**

37

DAN RYAN BUILDERS, INC. v. CRYSTAL RIDGE DEV., ET AL    1:09CV161

MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW

> **the date hereof.** [DRB] agrees not to exceed weight limits set by the City of Bridgeport.
>
> In addition, **as of the date hereof**, there are areas of curb that may have been **incorrectly installed** or **damaged subsequent to installation. [LBI] shall be responsible for repair and/or replacement of such areas as determined by the City of Bridgeport.** The parties will preserve the amount of damage and its location by photographic or video methods as of the date hereof. Additionally, there is approximately 150 linear feet of missing curb, which shall be the responsibility of [DRB] to install. **Repairs to the curb may be made at a later date but must be made before the top coat of blacktop and must be accepted by the City of Bridgeport.**

Id. at 1 (emphasis added). Approximately ninety-three (93) pictures, consisting of close-up shots of various roadway and curbing flaws, were attached to the Acknowledgment. Id. at 2-11.

### iii. Testimony

#### (a). The Breach

During the bench trial, Lang admitted that LBI neither completed any of the identified repairs nor installed the final wearing course of asphalt on Emerald Drive. (Trial Tr. 844:10-16). Minney testified that LBI did not perform the repairs or paving because there was an "encroachment issue on the upper piece of property with some turnarounds," i.e., DRB had utilized property owned by LBI, without permission, to construct several turnarounds for the Crystal Ridge subdivision. Id. at 591:16-18. During his

38

DAN RYAN BUILDERS, INC. v. CRYSTAL RIDGE DEV., ET AL    1:09CV161

MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW

testimony, Lang confirmed that he had refused to fulfill his roadway and paving obligations "[b]ecause I went up there one day and there was . . . maybe five turnarounds that were put across the property line, off of the development property onto our personal property and nobody called and talked to us or asked us to do that[.]" Id. at 844:18-22.

Both Minney and Lang testified Lang had sent a "letter or e-mail" to Rusch proposing a settlement of sorts and advising that LBI was "not interested in putting down . . . the wearing course on Emerald Drive or fixing the curb and gutter," id. at 592:13-16, and would exchange permission for the turnarounds for "not doing any of the repairs to the curb and gutters and the streets." Id. at 845:1-3. Lang testified that Rusch had responded with a letter "disagreeing with that[,] and that's sort of where the whole thing got left." Id. at 845:5-6.

### (b). Damages

DRB presented its damages by way of a summary exhibit through the testimony of Rusch. It did not seek to admit the underlying records. The summary exhibit breaks down DRB's $220,432.09 claim as follows:

39

DAN RYAN BUILDERS, INC. v. CRYSTAL RIDGE DEV., ET AL    1:09CV161

MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW

| Invoice Date | Explanation | Contractor/Engineer | Cost |
|---|---|---|---|
| 8/27/2007 | Asphalt Base Paving | Stone Paving, Inc. | $4,440.00 |
| 9/4/2007 | Digging for Road Repairs | Bryco Bore & Pipe, Inc. | $220.00 |
| 9/7/2007 | Asphalt Base Paving | Stone Paving, Inc. | $4,368.58 |
| 10/25/2007 | Stakeout Required by Road Redesign | Thrasher Engineering | $3,035.76 |
| 11/4/2007 | Undercut Jade Court | Bryco Bore & Pipe, Inc. | $1,620.00 |
| 11/16/2007 | Haul Dirt to Lot 18 | Thrasher Engineering | $250.00 |
| 12/26/2007 | Asphalt Repair to Crystal Ridge Entrance | Stone Paving, Inc. | $1,925.00 |
| 12/28/2007 | Curb Repair – Emerald Drive | Bryco Bore & Pipe, Inc. | $2,024.00 |
| 1/17/2008 | 270' Curb Repairs at Crystal Ridge | Bryco Bore & Pipe, Inc. | $5,940.00 |
| 2/20/2008 | Cost of Turnaround in Contract | Bryco Bore & Pipe, Inc. | $17,000.00 |
| 3/25/2008 | Patch Holes on Emerald Drive | Bryco Bore & Pipe, Inc. | $748.00 |
| 4/11/2008 | Patch Holes on Emerald Drive | Bryco Bore & Pipe, Inc. | $748.00 |
| 6/9/2009 | Road Stakeout | Thrasher Engineering | $566.50 |
| 11/2/2009 | Concrete Repair | Stone Paving, Inc. | $63,740.00 |
| 11/2/2009 | Base Repair | Stone Paving, Inc. | $71,610.00 |
| 11/2/2009 | Top Coat | Stone Paving, Inc. | $40,296.25 |
| 12/24/2009 | Misc. Construction for Roads | Premier Contracting, LLC | $1,900.00 |
|  | **TOTAL** |  | **$220,432.09** |

40

DAN RYAN BUILDERS, INC. v. CRYSTAL RIDGE DEV., ET AL    1:09CV161

**MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S**
**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

(Pl. Rev. Ex. 9 at 7).

In its entirety, Rusch's direct examination on this portion of

the summary exhibit consists of the following:

> Q. Are these costs and expenses related to the work that
> Lang Brothers did not do under the acknowledgment?
> A. Under the acknowledgment to include -- and including
> the first amendment to the Lot Purchase Agreement and **any**
> **obligations that were left in regards to one of the**
> **latter paragraphs in that Lot** -- in the first amendment
> that refers -- if it's not spelled out in this agreement,
> the Lot Purchase Agreement is still in effect.
> Q. Okay. But nonetheless all related to work on roadways
> and curbs?
> A. Yes sir.
> Q. And the total of that one is $220,432.90?
> A. Yes sir it is.

(Trial Tr. 533:5-17) (emphasis added).[25]

On cross-examination, LBI elicited from Rusch a concession

that at least three items of DRB's claimed damages - the $1,620

expense related to Jade Court, the $17,000 charge for a turnaround,

and the $3,035.76 expenditure for a "stakeout" - were not repairs

to Emerald Drive, which was the only roadway in existence at the

time the parties executed the First Amendment to the LPA, id. at

---

[25] Although Rusch's interpretation of this exhibit is fairly
broad, the Court notes that counsel for DRB agreed at the
conclusion of the bench trial that the relevant section of the
summary exhibit "absolutely" reflected "work by Dan Ryan Builders
that Lang Brothers didn't do under the Acknowledgment Agreement."
(Trial Tr. 1675 19:24).

DAN RYAN BUILDERS, INC. v. CRYSTAL RIDGE DEV., ET AL      1:09CV161

MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW

94:24-25. Rather, they were "off site" improvements or expenses for subsequently constructed infrastructure on later-developed portions of the subdivision. Id. at 553:1 - 555:15; see also id. at 592:4-6, 844:18-22. Rusch also could not identify the origin of the $1,900 charge for "Misc. Construction for Roads." Id. at 562:10-12.

   With respect to the three charges on November 9, 2009, for "concrete repair," "base repair," and "top coat," Rusch stated that those charges were related to "finish[ing]" Emerald Drive so that it could be taken over by the City. Id. at 568:5-12. Specifically, he testified that the $63,740.00 charge for concrete repair was for "the resurfacing and literally painting of the curbs along Emerald Drive due to the fact of the numerous repairs that were done in the curbing," i.e., that the City of Bridgeport required DRB, after it had repaired the curbs, to paint them all the same color. Id. at 558:20-22. With respect to the $71,610 charge for "base repair," Rusch testified that, while "he would want to pull the invoice to confirm this," he believed that the charge related "to the ground under the basecoat of asphalt where there were failures occurring, springs that weren't mitigated when the –- when the roads were initially installed that the City required us repair[.]" Id. at 561:24 - 562:9.

42

DAN RYAN BUILDERS, INC. v. CRYSTAL RIDGE DEV., ET AL    1:09CV161

MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW

LBI also questioned two other witnesses, Minney, its employee, and Brown, the engineer for the City of Bridgeport, who suggested that at least some of DRB's itemized charges were the result of damage that had occurred after DRB took over the development of the subdivision. Minney testified that, from his vantage point across Route 50 at LBI's office, he had observed numerous contractors employed by DRB performing work at Crystal Ridge, and believed it was "absolutely" possible some of DRB's claimed damages to the curbs and streets were caused by those contractors subsequent to the parties' joint inspection. Id. at 592:23 - 594:2. Brown testified he had observed significant damage to the curbs and roadways that "appeared primarily to be from equipment running across the curbs." Id. at 1346:17-20. He agreed that the damage was likely from "contractors or subcontractors," as well as "waste management," id. at 1346:21 - 1347:5, and stated that the damage he personally had observed was from DRB's subcontractors, although he could not say "without question" that "somebody else do not do it[.]" Id. at 1347:21 - 1348:7.

### iv. Conclusion

LBI unambiguously agreed (1) to make "**all** . . . repairs" identified by the parties' inspection within sixty (60) days; (2)

43

DAN RYAN BUILDERS, INC. v. CRYSTAL RIDGE DEV., ET AL   1:09CV161

MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW

failing that, to "retain . . . responsibility for any work required by the Bridgeport Checklist for release of [LBI's] letters of credit on Lots 1-50"; and, in any event, (3) "install the final wearing course of pavement of asphalt on Emerald Drive." (J. Ex. 3 at 5) (emphasis added). It failed to live up to any of these obligations. Consequently, the Court has little trouble concluding that DRB has established, by a preponderance of the evidence, that LBI breached Paragraph 10 of the First Amendment to the LPA.[26] The question of its damages, however, is more challenging.

Rusch's testimony regarding this category of damages is a matter of some concern. He demonstrated a fundamental misunderstanding of DRB's contractual obligations with respect to

---

[26] The Court is unpersuaded by LBI's argument, which it raised for the first time in its post-trial brief, that DRB should be precluded from raising a breach of contract claim pursuant to the LPA or the First Amendment to the LPA because it "failed to comply with said contracts in a multitude of ways." (Dkt. No. 257 at 36). With respect to the roadway and curbing issues, the only conceivably relevant "breach" identified by LBI is DRB's failure to provide official "Notice of . . . default" pursuant to Paragraph 9(c) of the LPA. (J. Ex. 1 at 8). To the extent that this provision is applicable to the First Amendment, which is less than clear, LBI cannot dispute that it had actual notice of its breach of Paragraph 10 of the First Amendment to the LPA - and ample opportunity to cure that breach - via the numerous written exchanges between Lang and Rusch. Particularly in light of Lang's testimony on this very issue, LBI cannot now rely on the technical deficiency of DRB's notice to escape liability from what was evidently a considered and purposeful breach of its contractual obligation.

**DAN RYAN BUILDERS, INC. v. CRYSTAL RIDGE DEV., ET AL    1:09CV161**

**MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW**

subsequently-constructed infrastructure, and his recollection as to several of the itemizations was, at best, indistinct. After considering the totality of the evidence presented, the Court concludes that DRB has established, by a preponderance of the evidence, that the three expenses for finishing Emerald Drive - the $63,740.00, $71,610.00, and $40,296.25 charges from Stone Paving, Inc. - were proximately caused by LBI's breach of Paragraph 10 of the First Amendment to the LPA.

DRB, however, has simply failed to establish a satisfactory nexus and link the remaining damages in its summary exhibit to LBI's breach. For these reasons, the Court finds that LBI is liable to DRB in breach of contract for the sum total of $**175,646.25.**

Furthermore, interest must be awarded on any monetary judgment, with interest accruing for special or liquidated damages from the date of the accrual of the cause of action. W. Va. Code § 55-6-31(a). The interest rate shall not be below 7%. Id. at § 31(b). Because there is no statutory authority for assessing compound interest, the interest is computed using a simple interest

DAN RYAN BUILDERS, INC. v. CRYSTAL RIDGE DEV., ET AL    1:09CV161

MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW

formula.[27] Syl. Pt. 4, <u>Hensley v. W. Virginia Dept. of Health &
Human Res.</u>, 508 S.E.2d 616 (W. Va. 1998).

Pre-judgment interest is to be computed on the special damages
portion of the final judgment, not the total verdict. <u>State Farm
Mut. Auto. Ins. Co. v. Rutherford</u>, 726 S.E.2d 41, 47 (W. Va. 2011).
All credits, payments, and set-offs should be deducted before
computing the award of pre-judgment interest. <u>Id</u>. at 46.

Here, DRB's special damages amount to $175,646.25.  The cause
of action in this case accrued on May 17, 2008, the date of PSR's
Geotechnical evaluation.  The rate of interest on judgments in 2008
was 8.25%. <u>Interest on Judgments and Decrees for the Year 2008</u>,
Administrative Office of the West Virginia Supreme Court of Appeals
(September   17,   2013)http://www.courtswv.gov/legal-community
/pdfs/Interest2008.pdf.  The interest rate remains constant from

---

[27] Compound interest is "interest upon interest, where accrued
interest is added to the principal sum, and the whole treated as
a new principal, for the calculation of the interest for the next
period." <u>10B Michie's Jurisprudence: Interest</u> § 2, at 393
(footnote omitted). By contrast, simple interest is interest
"which is paid for the principal or sum lent, at a certain rate
or allowance, made by law or agreement of parties." *Id.* Simple
interest does not contemplate the payment of interest upon
interest. <u>Hensley</u>, 508 S.E.2d at 624.

DAN RYAN BUILDERS, INC. v. CRYSTAL RIDGE DEV., ET AL    1:09CV161

MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW

2008-the date of accrual-until the date of entry of this judgment. W.Va. Code § 56-6-31. Thus, the pre-judgment interest owed to DRB is $14,490.82 per year, from the date of May 17, 2008 until the date of entry of this judgment. Using a special interest formula, this amount equals **$77,615.21**.[28] In federal civil actions brought under diversity jurisdiction, post-judgment interest is computed using the federal rate governed by 28 U.S.C. § 1961. Forest Sales Corporation v. Bedingfield, 881 F.2d 111, 111-12 (4th Cir. 1989). The rate is based on the 1-year constant maturity Treasury yield for the prior week, as published by the Board of Governors of the Federal Reserve System. 28 U.S.C. § 1961. The current rate for the week ending September 20, 2013, is .08%. Selected Interest Rates, Board of Governors of the Federal Reserve (September 20, 2013) http://www.federalreserve.gov/releases/h15/current/.

---

[28]Simple interest calculations do not contemplate the addition of interest upon interest. Thus, to perform a simple interest calculation for pre-judgment interest, one must merely multiple the fixed yearly prejudgment interest amount owed by the amount of time that has elapsed between the accrual of the cause of action and the entry of judgment. Hensley, 508 S.E.2d at 624.

The calculation used to determine the amount of pre-judgment interest owed in this case is as follows: $14,490.82 *(yearly pre-judgment interest owed)* x 5 *(years elapsed)*+[130 *(portion of the 2013 year)*/365 x $14490.82].

47

DAN RYAN BUILDERS, INC. v. CRYSTAL RIDGE DEV., ET AL      1:09CV161

MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW

Finally, the Court finds that damages for annoyance and inconvenience are inappropriate in this case. DRB alleges that it is entitled to an award for annoyance and inconvenience due to LBI's negligence which caused temporary injury to and loss of use of DRB's real property. (Dkt. No. 256 at 67). However, awards for annoyance or inconvenience are typically granted in non-commercial situations where the damages alleged were not already contemplated by the contract. Jarrett v. Harper & Son, 160 W.Va. 399, 404 (1977). Here, by contrast, DRB experienced damages in a commercial setting that were, in fact, contemplated by its contract with LBI. Thus, the contract is the most appropriate place to look when determining damages in this case.

Moreover, DRB has failed to provide the Court with evidence of specific annoyances and inconveniences it faced due to its injury. Damages which are recoverable at law must not only be the proximate result of the defendant's action but must also be capable of ascertainment, rather than speculative and uncertain in their nature. See Kyle v. Ohio R. Co., 49 W.Va. 296, 300 (1901); Jarrett, 160 W.Va. at 404-05. DRB argues that it is entitled to ten percent of its expenses–$195,142.23–due to the annoyance and inconvenience it faced. However, DRB does not give any justification for this

48

DAN RYAN BUILDERS, INC. v. CRYSTAL RIDGE DEV., ET AL    1:09CV161

MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW

number nor does it provide the Court with a description of the annoyances and inconveniences it has experienced. Thus, DRB has provided the Court with no guidance as to how to ascertain a certain and non-speculative award for its alleged annoyance and inconvenience.

### b.   Entrance Easement[29]

DRB claims that LBI "breached the warranty of good and marketable fee simple title to the property contained in Paragraph 6(a) of the [LPA]" because the entrance to Crystal Ridge was on property owned by Middletown Home Sales, Inc. (Dkt. No. 256 at 57). According to DRB, as a result of this breach, it was forced to purchase the property comprising the entrance for $35,000.00 and pay attorneys' fees in the amount of $832.53. Id. at 53.

Paragraph 6(a) of the LPA, which serves as the basis for this claim, provides:

> Seller owns good and marketable fee simple title to the Property, including all mineral and subterranean rights (except those rights subject to grants or reservations of record existing as of the date of this Contract), free and clear of liens, encumbrances, restrictions, and

---

[29] The Court notes that, although DRB refers to this claim as one arising from the purchase of an "entrance easement," DRB did not purchase an easement over the property in question - it purchased the property outright.

DAN RYAN BUILDERS, INC. v. CRYSTAL RIDGE DEV., ET AL    1:09CV161

MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW

> easements of any kind whatsoever, excepting only those
> matters disclosed herein.

(J. Ex. 1 at 4). The "Property," in turn, is defined in the LPA as

> that certain parcel of land situate in the Simpson
> District of Harrison County, West Virginia and which land
> is shown on Parcel 6 on Tax Map 310 (the "Property"),
> which Property is intended to be  subdivided into one
> hundred and forty-three (143) single family Lots, to be
> known as the "Rob Lang" subdivision (each referred to as
> "Lot" or collectively as the "Lots" or the "Property") as
> currently shown on the preliminary plan titled "Crystal
> Ridge Subdivision" (the "Preliminary Plan"), a copy of
> which has been provided to Seller.

Id. at 1.

During the trial, DRB provided the Court with neither "Parcel 6 of Tax Map 310," nor the specific "Preliminary Plan" referenced in the LPA. The plans that are in evidence, however, including one "Preliminary Plat," uniformly depict the entrance to Crystal Ridge on the property of an entity called either "Middletown Home Sales" or "American Home Sales." See, e.g., (J. Ex. 12, 13, 14). Indeed, Rusch, who was DRB's only witness to speak to this issue, admitted that he was aware of this fact, as "[every plat that [he] had seen showed] American Home Sales listed" as the owner of that property. (Trial Tr. 534:18-19). Lang, for his part, testified that the location of the entrance was a matter of common knowledge "on all the drawings and plans." Id. at 834:1-3.

50

DAN RYAN BUILDERS, INC. v. CRYSTAL RIDGE DEV., ET AL    1:09CV161

MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW

In short, DRB has adduced no evidence in support of its implausible conclusion that the "Property" expressly warranted in Paragraph 6(a) of the LPA included the land owned by Middletown Home Sales. The Court therefore rejects this claim.

### c.   Stormwater Management and Erosion Control Systems

DRB argues that LBI failed to comply with Section 1(F) of Exhibit B to the LPA, which required it to "construct, complete and maintain all storm drainage facilities, stormwater structures, pipes, facilities, stormwater management systems, sedimentation and ecology controls as shown on and as required by the approved development plans, or required by all appropriate agencies[.]" (J. Ex. 1 at 15). It claims it suffered damages in the amount of $112,253.92 as a consequence of LBI's breach.

### i.   Relevant Contractual Duties

DRB is correct in that, under Section 1(F) of Exhibit B to the original LPA, LBI was charged with various duties related to the stormwater management and erosion control systems. (J. Ex. 1 at 15). These duties, in pertinent part, were as follows:

> Construct, complete and maintain all storm drainage facilities, stormwater structures, pipes, facilities, stormwater management systems, sedimentation and ecology controls as shown on and as required by the approved development plans, or required by all appropriate governmental authorities except for individual on-Lot

51

DAN RYAN BUILDERS, INC. v. CRYSTAL RIDGE DEV., ET AL     1:09CV161

MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW

silt control on Lots settled on by [DRB] during individual house construction thereon.

(J. Ex. 1 at 15). In the First Amendment to the LPA, however, DRB "agree[d] to **complete** the development work listed in Section 8(b)(iv) [of the LPA] on Lots 1-27." (J. Ex. 3 at 2) (emphasis added).

As noted above, Section 8(b)(iv) of the LPA cross-references Section 2 of Exhibit B, which, in turn, incorporates the development obligations listed in Section 1(F) of Exhibit B. (J. Ex. 1 at 6, 15-16). Put more simply, DRB, "[as of the date of Final Closing," i.e., no later than May 15, 2007, agreed to take over the "[construction], complet[ion] and maintenance] [of] all storm drainage facilities, stormwater structures, pipes, facilities, stormwater management systems, sedimentation and ecology controls" on Lots 1-27, and assumed those development obligations with respect to the remaining unfinished lots. (J. Ex. 1 at 15). In a separate provision of the First Amendment, DRB also expressly "assume[d] all responsibility for the maintenance and repair of the stormwater management pond in Phase I of the Subdivision." (J. Ex. 3 at 5).

DAN RYAN BUILDERS, INC. v. CRYSTAL RIDGE DEV., ET AL   1:09CV161

MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW

### ii.  Testimony

#### (a). Breach

HBE's design for the stormwater management system included two stormwater ponds and numerous other storm water devices. One stormwater pond, referred to as "Sediment Basin One," was located across Route 50, on the property that housed LBI's offices; the second pond, referred to as "Sediment Basin Two," was located at the entrance to Crystal Ridge by Lot 1. (Trial Tr. 112:8-22; 291:15-21).

As part of the First Amendment to Lot Purchase Agreement, LBI agreed to "assign its NPDES permit for phase I of the Subdivision to [DRB]," (J. Ex. 3 at 5), so that, in the words of Rusch, "any inspections, any deficiencies that were noted while [DRB] was] building the remainder of the site . . . [DRB] would be responsible." (Trial Tr. 113:12-16). In late October 2007, several months after the execution of the First Amendment but prior to the transfer of the permit, the DEP conducted an inspection of the site and issued three Notices of Violation to Lang. Id. at 290:16-19; (Pl. Ex. 14). The violations noted that Sediment Basin Two[30] did not have "the required capacities and draw down time," its sediment

---

[30]  (Trial Tr. 265:19-20).

53

DAN RYAN BUILDERS, INC. v. CRYSTAL RIDGE DEV., ET AL    1:09CV161

MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW

level was not "properly maintaine[d]," and that "sediment-laden water" was leaving the site without going through an "appropriate device." (Pl. Ex. 14 at 2, 4-5).

In late November 2007, DRB retained Charles Douglas Forni ("Forni"), a Project Engineer with Thrasher Engineering, to address the "erosion and sediment control issues" at the site. (Trial Tr. 263:2-6). Forni testified at trial and was qualified as an expert witness in civil engineering and construction principles as applied to the design and monitoring of stormwater management and sediment and erosion control systems.  Id. at 260:1-18.

Forni testified that some of the sediment traps - which he described as "holes in the ground" - were constructed on property that was no longer in DRB's control, that is, on lots previously sold to homeowners, a fact that caused him "concern." (Trial Tr. 267:21 - 269:11). Likewise, two of the planned sediment traps, meant to be located on Lots 20 and 23, "may not have been constructed or they may have been eliminated," but he did not know which. Id. at 269:12-16, 271:1-8. Forni stated that, because these sediment traps either were "not constructed" or had been "taken out of service," additional stormwater was being routed into Sediment Basin Two. Id. at 277:23 - 278:2. He also testified that Sediment

DAN RYAN BUILDERS, INC. v. CRYSTAL RIDGE DEV., ET AL    1:09CV161

### MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S FINDINGS OF FACT AND CONCLUSIONS OF LAW

Basin One either did "not exist" or there was no "access" to it, although he was not certain. Id. at 276:13-23.[31] In any event, Forni concluded that, as a result of the missing traps and sediment basin, Sediment Basin Two needed to be enlarged. Id. at 277:23 - 278:2.

Ultimately, Forni suggested several changes to DRB regarding the stormwater and sediment and erosion control systems at the site. Specifically, he recommended enlarging Sediment Basin Two, id. at 277:23 - 278:2, and proposed the addition of three sediment traps. Id. at 279:3-4. He submitted his proposal to the DEP, id. at 279:9-10, which, after further modification, accepted the plan. DRB implemented the plan as accepted. Id. at 280:4-283:9. In response to DRB's inquiry at trial as to whether he believed that "the construction of the stormwater and sediment and erosion control plan - when [he] first observed it in December 2007 . . . comported with the standards that would have applied to a contractor implementing such a plan," Forni answered, "No." Id. at 284:4-9.

---

[31]    Forni admitted that he never walked across Route 50, or even looked across to street, to determine whether or not Sediment Basin One had been constructed. (Trial Tr. 288:2-11). He also admitted that, assuming that Sediment Basin One was actually constructed, it could have been utilized to bring the stormwater management system into compliance. Id. at 289:23 - 290:1.

DAN RYAN BUILDERS, INC. v. CRYSTAL RIDGE DEV., ET AL     1:09CV161

MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW

### (b). Damages

Once again, DRB presented its damages through a summary exhibit during the testimony of Rusch, without admitting any of the underlying records. The summary exhibit breaks down DRB's $112,253.92 claim as follows:

| Invoice Date | Explanation | Contractor/Engineer | Cost |
|---|---|---|---|
| 3/7/2008 | Erosion Plans | Engineering Graphics | $15.90 |
| 4/25/2008 | Erosion & Settlement Control Plan | Thrasher Engineers | $3,180.07 |
| 4/25/2008 | Erosion & Settlement Control Plan | Thrasher Engineers | $8,928.89 |
| 6/11/2008 | Additional Catch Basin for Storm Water System | Bryco Bore & Pipe, Inc. | $2,500.00 |
| 7/29/2008 | Install Additional Catch Basin and Pipe for Storm Water System | Bryco Bore & Pipe, Inc. | $5,122.50 |
| 6/9/2009 | Erosion & Settlement Control Plan | Thrasher Engineers | $573.56 |
| 9/9/2009 | Enlarge Storm Water Pond | Dinges Transport, Inc. | $25,000.00 |
| 10/22/2009 | Fencing for Storm Water Pond | Alco Fence Co. | $21,333.00 |
| 12/24/2009 | Erosion & Settlement Control Plan | Thrasher Engineers | $600.00 |
|  | Lot 1 Market Value |  | $45,000 |
|  | **TOTAL** |  | **$112,253.92** |

(Pl. Rev. Ex. 9 at 6).

56

DAN RYAN BUILDERS, INC. v. CRYSTAL RIDGE DEV., ET AL    1:09CV161

MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW

With respect to this category of damages, Rusch testified:

This category -- this was not maintenance -- silt fence
installation, on-going rock ditch cleaning and general
things that you would see while a site was being
developed, because obviously we were at the top of the
site continuing development. The costs associated on here
occurred when the DEP showed up and -- and said we've got
a problem. The plans that were submitted to us are not
what was built. There was reference to the fact that the
plans that were submitted to the DEB [sic] did not
include curb and gutter but we're an open ditch line
community[32] and so this -- this basically takes it from
Thrasher Engineering's involvement through the
re-building up the stormwater pond, which I believe is
number two, if I'm getting that right and the subsequent
loss of lot number one due to the enlargement of the
stormwater pond at the entrance of Crystal Ridge, which
is the last cost on here, $45,000.00.

(Trial Tr. 531:24 - 532:14).

On cross-examination by LBI, Rusch testified that the "market

value" figure of Lot 1, $45,000, was derived from the "cost for

[DRB] to complete the development without any of the costs of the

remediation for any . . . cost to complete the infrastructure along

---

[32] Although much was made of the fact that the design of the
roadways changed from a "ditch line" to "curb and gutter," DRB
presented no evidence suggesting that this change did, in fact,
require any alterations to the system. The only evidence presented
on the issue was Mr. Carothers's testimony that the modification
did not require revisions to the stormwater and sedimentation
control design, (Trial Tr. 1441:2-5), and Paul Horner's testimony
that the change was not "significant." Id. at 1045:8-12, 1045:24 -
1046:3. Insofar as this modification is concerned, then, it appears
to be unmoored from any of the claimed damages in this case.

DAN RYAN BUILDERS, INC. v. CRYSTAL RIDGE DEV., ET AL    1:09CV161

MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW

Garnet Way." Id. at 557:23 - 558:1. With respect to the $21,333 charge for "Fencing for Stormwater Pond," he stated that HBE's original plans did not call for fencing, but that the City of Bridgeport later had required DRB to install it. Id. at 562:13 - 563:4.

### iii. Conclusion

DRB failed to provide any discernable connection between the expenses identified in its summary exhibit and LBI's purported breach of Section 1(F) of Exhibit B to the LPA. In the First Amendment to the LPA, DRB assumed responsibility for "complet[ing] the development work," including the responsibilities listed in Section 1(F). (J. Ex. 3 at 2). Rusch testified that, as of May 7, 2007, DRB was in complete control of the sequence, methods, and manner of construction at the property. (Trial Tr. 227:10-14). Indeed, it had begun hiring other subcontractors to perform work at the property as of that date. Id. 227:15-19.

Forni was not on the property until late November 2007. Id. at 263:2-6. At that time, DRB had been in charge of construction for over six months. With respect to the two "missing" sediment traps, Forni was only able to say that, as of December 2007, they simply weren't there. Given the intervening six-month period between LBI's

58

DAN RYAN BUILDERS, INC. v. CRYSTAL RIDGE DEV., ET AL     1:09CV161

MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW

presence on the site and Forni's arrival, the mere absence of the traps does not suffice to impute liability to LBI.

Further, concerning Sediment Basin One, the evidence convincingly established that it had been constructed.[33] It appears that DRB simply elected to change the original sediment control plan from two smaller ponds to one large pond because it no longer wished to deal with LBI. See, e.g., id. at 196:7-9. It does not follow from this choice, however, that LBI breached its contractual obligations in the first instance. To the contrary, pursuant to the First Amendment to the LPA, Carothers "reviewed the as-built information for Crystal Ridge that was provided by Rick Adams,"

---

[33]   Forni admitted that it would have been important for the DEP to examine whether Sediment Basin One was constructed. (Trial Tr. 290:23 - 291:14). He further admitted that the DEP would have noted the absence of Sediment Basin One on a violation. Id. at 291:2-8. None of the DEP violations or inspection letters mention the failure to construct Sediment Basin One. Id. at 290:16-19, 292:10-293:7. Neither Rusch, nor anyone else at DRB, ever determined whether Sediment Basin One had been constructed. Id. at 196:4-10. Minney testified that Sediment Basin One was constructed and operational. Id. at 585:20-587:412. Lang testified that Sediment Basin One was constructed and, as of a week prior to trial, still existed. Id. at 831:5-11. Corathers testified that Sediment Basin One was constructed and still exists. Id. at 1383:12-17; 1461:22-1462:3. Brown testified that Crystal Ridge was designed to be serviced by only one sediment basin located on the Crystal Ridge side of Route 50. Id. at 1348:25 - 1350:13. Corathers, however, testified that Brown was simply mistaken. Id. at 1457:7-22.

DAN RYAN BUILDERS, INC. v. CRYSTAL RIDGE DEV., ET AL    1:09CV161

MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW

including the storm sewer and sediment basin, and concluded that, although there were a few minor deviations from HBE's plan,[34] those deviations would not affect the functionality of the design. Id. at 1391:3 – 1392:8; (J. Ex. 8).

In sum, DRB failed to adduce sufficient evidence to establish that LBI breached its contractual duties with respect to the stormwater management and erosion control systems as contained in Section 1(F) of Exhibit B to the LPA. To the extent that DRB modified that system subsequent to the execution of the First Amendment to the LPA, either by its own election or at the request of the City, it had contractually assumed responsibility for the same. The Court thus rejects this claim.

d.   Miscellaneous Bad Work

DRB claims that LBI failed to perform its contractual obligations as set forth in Section 1(d) of Exhibit B to the LPA and Schedule 1 of the LPA, because "the infrastructure plans failed to identify locations at which it was necessary to install twelve inch steel casing." (Dkt. No. 256 at 58). DRB contends that, as a

_____

[34] With respect to Sediment Basin Two, for example, Corathers noted that it was in fact constructed slightly larger in volume than as designed. (J. Ex. 8); (Trial Tr. 1392:9-14). He testified that this variation actually enabled Sediment Basin Two to handle more stormwater. (Trial Tr. 1393:2-9.)

DAN RYAN BUILDERS, INC. v. CRYSTAL RIDGE DEV., ET AL   1:09CV161

MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW

result, it "incurred expenses in the amount of $13,200 to install the steel casing." Id.[35]

### i.   Relevant Contractual Duties

Under Exhibit B to the LPA, LBI was responsible for "construct[ing] and complet[ing] all infrastructure," (J. Ex. 1 at 14), and obtaining a "preliminary plan" and design plans for "sediment control," "water and sewer," "pavement design," "storm drainage," and "storm water." (J. Ex. 1 at 20). Once again, however, DRB agreed to take over the remaining development responsibilities for the subdivision when the parties executed the First Amendment to the LPA. (J. Ex. 3 at 2).

### ii.   Testimony

Rusch testified that the two $6,600 steel casing expenditures "had to do with requirements of the City of Bridgeport that were not on the construction drawings and that were required . . . for [DRB] to install." (Trial Tr. 537:15-18). On cross examination, he confirmed that the steel casings were "additional piping that the City required that wasn't on the plans that Hornor Brothers had

_____

[35] DRB initially claimed damages in the amount of $55,036.98 for LBI's "miscellaneous bad work," but it conceded in its post-trial memorandum that it had failed to adduce sufficient evidence at trial to attribute $41,836.98 of those charges to LBI. (Dkt. No. 256 at 54).

DAN RYAN BUILDERS, INC. v. CRYSTAL RIDGE DEV., ET AL    1:09CV161

MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW

prepared" for Phase I of the Subdivision. Id. at 550:13-20. He went on to state that the steel casings were for the "upper portion" of the development, Garnet Way, where LBI had not performed any work. Id. at 550:17-24. He then backtracked somewhat, stating that he believed only one of the steel casings was for Garnet Way, while the other was "for the entrance," Id. at 552:9-14, although he would need to "research the invoice" to be sure. Id. at 552:11. DRB elicited no other testimony with respect to this purported breach.

### iii. Conclusion

DRB has wholly failed to meet its burden of proof with regard to this claim. The evidence does not even establish what the steel casings were for, much less whether LBI was obliged to pay for them. Indeed, the only evidence on this issue demonstrates that Bryco Bore & Pipe installed the casings on August 12, 2007, and September 28, 2008, (Pl. Rev. Ex. 9 at 9), several months after the execution of the First Amendment to the LPA and, consequently, several months after DRB assumed control over the development of the subdivision. (J. Ex. 3 at 2). Rusch could not state with any certainty where or why the steel casings were installed, but simply that the "City of Bridgeport" required DRB to do so. (Trial Tr. 537:15-18). This testimony, identifying little more than the fact

62

DAN RYAN BUILDERS, INC. v. CRYSTAL RIDGE DEV., ET AL     1:09CV161

MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW

that an expenditure was made, is simply insufficient to support a
breach of contract claim - particularly in light of Rusch's
statement that he would "have to research the invoice" to identify
the expenditure with any certainty. Id. at 552:11. The Court
therefore rejects this claim.

**B. NEGLIGENCE**

DRB contends that LBI's negligence caused (1) the failure of
the fill embankment along Lots 2 through 7, (2) the failure of the
cut slope behind Lots 15 through 17, (3) compaction issues on other
lots; and (4) issues with "bad soil" on Lot 10. (Dkt. No. 256 at
58). As explained below, the Court concludes that DRB has failed to
establish its negligence claims as a matter of law.

**1.   LEGAL STANDARD**

**a.   Negligence**

"[N]egligence is the violation of the duty of taking care
under the given circumstances," which is "always relative to some
circumstances of time, place, manner, or person." Marcus v. Stabs,
736 S.E.2d 360, 370 (W. Va. 2012) (quoting Dicks v. Liverpool Salt
& Coal Co., 23 SE 582 (W. Va. 1895)). In order to establish a
negligence claim under West Virginia law, a plaintiff must prove by
a preponderance of the evidence that "[1] the defendant owed a

63

DAN RYAN BUILDERS, INC. v. CRYSTAL RIDGE DEV., ET AL    1:09CV161

MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW

legal duty to the plaintiff and [2] that by breaching that duty [3] the defendant proximately caused the injuries of the plaintiff." Needy v. Balk Inc., 668 S.E.2d 189, 197 (W. Va. 2008) (quoting Webb v. Brown & Williamson Tobacco Co., 2 S.E.2d 898, 899 (W. Va. 1939)).

"[T]he threshold question in all actions in negligence is whether a duty was owed." Needy, 668 S.E.2d at 197; see also Syl. Pt. 1, Parsley v. Gen. Motors Acceptance Corp., 280 S.E.2d 703 (W. Va. 1981) ("No action for negligence will lie without a duty broken."). The determination of whether a plaintiff is owed a duty of care by a defendant must be rendered by the court as a matter of law. Syl. Pt. 5, Aiken v. Debow, 541 S.E.2d 576 (W. Va. 2000). The West Virginia Supreme Court of Appeals ("Supreme Court of Appeals") has held that:

> The ultimate test of the existence of a duty to use care is found in the foreseeability that harm may result if it is not exercised. The test is, would the ordinary man in the defendant's position, knowing what he knew or should have known, anticipate that harm of the general nature of that suffered was likely to result?

Marcus, 736 S.E.2d at 370 (quoting Syl. Pt. 3, Sewell v. Gregory, 371 S.E.2d 82 (W. Va. 1988)).

In order to prevail on a negligence claim, a plaintiff must show that the defendant's negligence was the "proximate cause" of

64

DAN RYAN BUILDERS, INC. v. CRYSTAL RIDGE DEV., ET AL     1:09CV161

MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW

its injury. Syl. Pt. 11, <u>Anderson v. Moulder</u>, 394 S.E.2d 61 (W. Va. 1990) (citations omitted). The "proximate cause" is one "which, in natural and continuous sequence, produces foreseeable injury and without which the injury would not have occurred. Thus, the test requires both (1) foreseeable injury; and (2) but-for causation." <u>Grant Thornton, LLP v. Federal Deposit Ins. Corp.</u>, 435 F. App'x 188, 194 (4th Cir. 2011) (internal quotation marks and citation omitted); <u>see also</u> <u>Aiken</u>, 541 S.E.2d at 581. Notably, a plaintiff need only "show that a defendant's breach of a particular duty of care was **a** proximate cause of the plaintiff's injury, not the <u>sole</u> proximate cause." <u>Mays v. Chang</u>, 579 S.E.2d 561, 565 (W. Va. 2003) (emphasis in original). Indeed, "[o]ne who has committed a breach of duty is liable for its natural and proximate effects, which may be immediate or through the subsequent media of natural forces or other innocent causes." <u>Riffe v. Armstrong</u>, 477 S.E.2d 535, 556 (W. Va. 1996) (citation omitted).

### b.  Gist of the Action Doctrine

Under West Virginia law, "[i]f the action is not maintainable without pleading and proving the contract, where the gist of the action is the breach of the contract, either by malfeasance or misfeasance, it is, in substance, an action on the contract,

65

DAN RYAN BUILDERS, INC. v. CRYSTAL RIDGE DEV., ET AL    1:09CV161

MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW

whatever may be the form of the pleading." Cochran v. Appalachian Power Co., 246 S.E.2d 624, 628 (W. Va. 1978). This so-called "gist of the action" doctrine provides that a tort claim arising from a breach of contract may be pursued only if "'the action in tort would arise independent of the existence of the contract.'" Secure US, Inc. v. Idearc Media Corp., No. 1:08CV190, 2008 WL 5378319, at *3-4 (N.D. W. Va. Dec. 24, 2008) (quoting Syl. Pt. 9, Lockhart v. Airco Heating & Cooling, 567 S.E.2d 619 (W. Va. 2002)). In other words, "[t]he source of the duty is controlling. To be maintained, the action in tort must arise independent of the existence of the contract." CWS Trucking, Inc. v. Welltech Eastern, Inc., No. 2:04-CV-84, 2005 WL 2237788, at *2 (N.D. W. Va. 2005) (citing Syl. Pt. 9, Lockhart, 567 S.E.2d 619).[36]

---

[36] See also Steel v. W. Va., Inc. v. AMI G.E., LLC, No. 3:09-0005, 2009 WL 1648915, at *2 (S.D. W. Va. June 10, 2009) (dismissing negligence claim where "[b]ut for the contract, Defendant would have no duty to provide engineering services to Plaintiff and Defendant would owe no duty of care to Plaintiff. There simply is no independent basis aside from the contract upon which Plaintiff's negligence claims could arise."); Cavcon, Inc. V. Endress Hauser, Inc., 557 F.Supp.2d 706, 723-24 (S.D. W. Va. 2007) ("Where the duty is one based solely upon contract, the plaintiff's remedy is for breach of contract rather than negligence. To the extent plaintiff's negligence claim is based on a duty set forth in the agreement, it fails." (citation omitted)); McClure v. Elmo Greer & Sons of Ky., LLC, 369 F.Supp.2d 832, 838 (N.D. W. Va. 2005) (awarding summary judgment in favor of the defendant where "the plaintiffs would not be able to allege a claim in tort in the

DAN RYAN BUILDERS, INC. v. CRYSTAL RIDGE DEV., ET AL     1:09CV161

MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Supreme Court of Appeals recently affirmed the continued vitality of this doctrine, finding that "recovery in tort will be barred" where any of the following four factors is present:

> (1) where liability arises solely from the contractual relationship between the parties; (2) when the alleged duties breached were grounded in the contract itself; (3) where any liability stems from the contract; and (4) when the tort claim essentially duplicates the breach of contract claim or where the success of the tort claim is dependent on the success of the breach of contract claim.

Gaddy Engineering Co. v. Bowles Rice McDavid Graff & Love, LLP, 746 S.E.2d 568 (W. Va. 2013) (quoting Star v. Rosenthal, 884 F.Supp.2d 319, 328-29 (E.D. Pa. 2012)). Accordingly, in order to maintain a cause of action for tort, a plaintiff must establish the existence of a legal duty independent from any contractual duty.[37] Lockhart, 567 S.E.2d at 624 ("[A plaintiff] cannot maintain an action in tort for an alleged breach of a contractual duty."); see also Sewell, 371 S.E.2d at 84 ("In matters of negligence, liability attaches to

_____

absence of the contract," as under West Virginia law, "a separate tort claim can go forward only if it would be viable in the absence of a contract between the parties" (citing Syl. Pt. 9, Lockhart, 567 S.E.2d 619)).

[37] The gist of the action doctrine is applicable to this case even though the parties did not brief the issue, since the Court is obligated to look beyond the face of the pleadings to determine the true nature of the dispute.

DAN RYAN BUILDERS, INC. v. CRYSTAL RIDGE DEV., ET AL    1:09CV161

MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW

the wrongdoer, not because of a breach of a contractual relationship, but because of a breach of duty[.]")

## 2.   DISCUSSION

DRB divides its negligence claims into four basic categories: (1) the failure of the fill embankment along Lots 2 through 7; (2) the failure of the cut slope behind Lots 15 through 17; (3) the compaction issues on other lots; and (4) the "bad soil" damages (Dkt. No. 256 at 58, 65). The Court will address each of these categories in turn.

### a.   Slope Failure Behind Lots 2-7

DRB argues that LBI failed to adhere to the appropriate standard of care in constructing the fill embankment along Lots 2 through 7, and that its failure was the proximate cause of the ensuing landslide. (Dkt. No. 256 at 66).

#### i.   Facts

##### (a). Soil Report

In accordance with Task IV of the May 4, 2005 contract between HBE and LBI, on September 16, 2005, HBE prepared and submitted the Site Registration for the Crystal Ridge development to the DEP. (J. Ex. 7 at 1). The Site Registration contains a "soil report" that states:

68

DAN RYAN BUILDERS, INC. v. CRYSTAL RIDGE DEV., ET AL   1:09CV161

MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW

> The following soil series apply to this permit application:
>
> CIC, FaC, GuC3, GuE3, WmD, WmE, WmF
>
> See the attached information for specific soil characteristics.

Id. at 49. The "attached information" includes a table entitled "[e]stimated degree and kinds of limitation for town and country planning." Id. at 51. That table, in turn, states that CIC presents "moderate" limitations with respect to "[d]wellings with basements," defined as "limitations that can be overcome with planning and careful design." Id. The table further states that FaC, GuC3, GuE3, WmD, WmE, and WmF, the remaining soils present at the site, all present "severe" limitations, defined as "limitations that are difficult and expensive to overcome." Id. at 51-53, 55. The table includes the following specific warnings, among others, for these soils: "slope," "high shrink-swell potential," and "slip hazard." Id.

Lang's signature, dated September 15, 2005, appears on the Site Registration immediately beneath the following paragraph:

> I CERTIFY UNDER PENALTY OF LAW THAT **I HAVE PERSONALLY EXAMINED AND AM FAMILIAR WITH THE INFORMATION SUBMITTED ON THIS FORM AND ALL ATTACHMENTS** AND THAT, BASED ON MY INQUIRING OF THOSE INDIVIDUALS IMMEDIATELY RESPONSIBLE FOR OBTAINING THE INFORMATION, THE INFORMATION SUBMITTED IS, TO THE BEST OF MY KNOWLEDGE AND BELIEF, TRUE,

69

DAN RYAN BUILDERS, INC. v. CRYSTAL RIDGE DEV., ET AL    1:09CV161

MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW

    ACCURATE, AND COMPLETE. I AM AWARE THAT THERE ARE SIGNIFICANT PENALTIES FOR SUBMITTING FALSE INFORMATION, INCLUDING THE POSSIBILITY OF FINE AND IMPRISONMENT.

Id. at 7 (emphasis added).

When questioned by his counsel, Lang testified that he understood what was in the Site Registration and "probably noticed" the adverse soil conditions. (Trial Tr. 825:3-5; 826:24). On cross examination, he stated more explicitly that he had both reviewed and understood the soils report. Id. at 904:16 - 905:7. He further admitted to recognizing that the identified soils presented a potential slide hazard, id. at 998:18-22, but that he did not feel it was necessary to "inquire" of HBE about soils testing. Id. at 992:9-14. Indeed, he testified that he had "worked in the soils on the property [of the Crystal Ridge site] before" and felt "competent" to assess them. Id. at 903:13-17. The questionable soils, according to Lang, were simply "sort of a design criteria that could be designed around." Id. at 905:12-16.

Notably, Rusch testified that DRB did not receive a copy of the Site Registration, id. at 160:13-15, and no party presented any evidence to the contrary.

70

DAN RYAN BUILDERS, INC. v. CRYSTAL RIDGE DEV., ET AL    1:09CV161

MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW

### (b). Slope Cross Sections

In early 2006,[38] Warrenfeltz spoke with Lang about the possibility of having LBI do the grading work on the lots for an additional sum of money. (Trial Tr. 771:2 - 772:16). Lang recalled that he advised Warrenfeltz that LBI "couldn't even give [DRB] a price" for the work without knowing "how many yards of excavation" would be required, as he "didn't know [. . .] how high they wanted to put the house on the lot or below the lot or just where anything was going[,] so [DRB] had to come up and give [LBI] some guidance on which direction to go with that." Id. at 768:7-12. In other words, LBI needed some basic information, e.g., earthwork volume computations, in order to begin negotiating the contract price for the grading work.

---

[38] The timeline on this conversation is somewhat confused. Lang initially testified that he believed he spoke with Warrenfeltz at some point after "February 2006," (Trial Tr. 771:16-20), but later stated that it must have been a "couple weeks prior" to March 13, 2006. Id. at 772:14-16.

DAN RYAN BUILDERS, INC. v. CRYSTAL RIDGE DEV., ET AL    1:09CV161

MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW

Presumably at some point after that conversation,[39] DRB asked John Hornor to prepare what the parties have referred to as "slope cross sections." Id. at 1470:2-4. Although the subject of some confusion prior to trial, the evidence at trial conclusively established that DRB, alone, procured the cross sections from HBE and gave them to LBI. See, e.g., id. at 184:12-20; 767:25-768:17; 768:18-769:3; 955:8-19; 1393:23 – 1394:5; 1466: 15-18, 1471:1-14. There was no written agreement between DRB and HBE concerning the preparation or purpose of the cross sections. Id. at 184:12-15.

John Hornor, a licensed surveyor, was the only person at HBE who worked on the cross sections. Id. at 1473:3-5, 1506:2-5.[40] He

---

[39] John Hornor first testified that "[he] believe[d] that [he] was contacted by DRB for drafting services on the cross sections in or about March or April of 2006." (Trial Tr. 1470:2-4). On cross examination, however, he stated that several itemizations on invoices from HBE to LBI, beginning on January 20, 2006, "appear[ed] to be" for work on the slope cross sections. Id. at 1509:15-21.

[40] Corathers agreed with Hornor on this point, confirming that he had "little to no involvement" with the cross sections, (Trial Tr. at 1394 at 6-9), and that he "played absolutely no part" in the fill slope. Id. at 1445:7-8. In its post-trial brief, DRB, pointing to billing invoices from HBE to DRB, proposes that Corathers' and Hornor's testimony on this issue is less than credible. (Dkt. No. 256 at 20). The Court disagrees. The billing invoices are inconclusive at best, and both Hornor and Corathers' testimony on this issue was credible.

DAN RYAN BUILDERS, INC. v. CRYSTAL RIDGE DEV., ET AL    1:09CV161

MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW

testified that Rusch had specifically requested a "drawing," id. at

1479:2-6, depicting the following:

> a generic house on either side, [] the height of the
> house above or below the road, [] the steepness of the
> drive and [. . .] some rough volume calculations so he
> [Rusch] could get a handle on how much earth was going to
> be moved.

Id. at 1475:7-12. Hornor testified that the cross sections, when

completed, reflected "rough calculations" and "ballpark figures,"

a fact that he had mentioned "numerous times" to Rusch. Id. at

1476:1-3. He characterized the cross sections themselves as "rough

yardage volumes," id. at 1578:11, and "volume calculations," id. at

1579:7, emphasizing that he "never intended the[m] to be used to

grade," but rather only "to provide a rough calculation for the

volume of earth that would have to be moved of cut versus fill[.]"

Id. at 1478:19-22.[41]

---

[41] Rusch also offered testimony on this issue, which the Court
declines to adopt. Rusch was not particularly clear on either the
purpose or the specifics of the agreement between DRB and HBE - he
wasn't even sure if HBE had been "formally hired" to do the work.
Id. at 184:14. He "believe[d]" that the slope cross sections "came
through Dave Warrenfeltz," whom he supervised, via John Hornor, id.
at 45:1-4, although John Horner was fairly adamant that he had
dealt with Rusch directly. Id. at 1471:12-23; 1568:4-5. Rusch, with
no further exposition, also summarily testified that the cross
sections were intended to be used to grade the lots, and that HBE
was aware of this purpose. Id. at 184:11, 188:10-12. It appears,
however, that this is something he simply "assum[ed]," Id. at
185:1. In any event, he later clarified that his discussions with

DAN RYAN BUILDERS, INC. v. CRYSTAL RIDGE DEV., ET AL     1:09CV161

MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW

### (c). Contract with Independent Contractor

In March 2006, Hornor completed the cross sections for Lots 1-9 and 19-26 and gave them to DRB. (J. Ex. 15); (Trial Tr. 1481:18 - 1482:3). DRB in turn gave the cross sections to Lang so that, in Lang's own words, he could "come up with some dollar figures to give [DRB] a quote on how much it was going to cost to -- to ready the lots lives [sic] for them." Id. at 772:24 - 773:1. The ultimate "dollar figure[]," as reflected in the Contract with Independent Contractor executed on April 4, 2006 (First Fill Slope Contract), was $100,000.00. (J. Ex. 4). In setting this price, Lang did not budget "anything" for engineering or the preparation of construction plans and specifications for the grading and drainage of the fill and cut slopes. (Trial Tr. at 897:1-2). He believed that it was "taken care of when [LBI] got the drawings," as he thought he "c[ould] do a little bit of engineering work with the

_____

HBE with respect to the slope cross sections were limited to "guidance in the parameters" of "the sizing of our homes and that type of thing, the driveway slopes. That would have been the extent because we weren't doing the earth work. We're not engineers. We're not earth movers." Id. at 188:13-22. Indeed, it is fully apparent to the Court that Rusch had no practical knowledge of, or real involvement in, the grading work at Crystal Ridge. See, e.g., (Trial Tr. 62:8-19).

DAN RYAN BUILDERS, INC. v. CRYSTAL RIDGE DEV., ET AL     1:09CV161

MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW

volumes and come up with haul distances [. . .] in our everyday work." Id. at 897:20-22.

In this First Fill Slope Contract, LBI agreed to "provide fill necessary to deliver finished buildable lots as described in the mass grading cross sections provided by [HBE] to [DRB] and [LBI]." (J. Ex. 4 at 1).[42] The "mass grading cross sections" identified in this contract were simply the "cross sections" prepared by John Hornor. (Trial Tr. 45:12). The lots included in this contract were Lots 1-9 and 19-26, i.e., the lots for which LBI had cross sections. (J. Ex. 4 at 1). The contract called for "compaction testing," and further provided that "[LBI] will be responsible for all costs incurred for the excavation, hauling and filling, as well as quality control measures necessary to complete the aforementioned lots." Id. There is no dispute that this contract is valid and enforceable.[43]

_____

[42] Contrary to the langauge of this agreement, HBE, as the Court has already found, did not give the cross sections to LBI. Indeed, as discussed in more detail infra, there is no evidence that HBE was even aware of this agreement. See, e.g., id. at 955:1-7.

[43] The actual contracts with independent contractor that were entered as exhibits were not signed by LBI. As DRB has emphasized, however, Lang testified that he signed the contracts, and further testified that his companies performed and received payment for the work called for in them. (Trial Tr. 760:3-6); (Dkt. No. 256 at 32).

75

DAN RYAN BUILDERS, INC. v. CRYSTAL RIDGE DEV., ET AL    1:09CV161

MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW

### (d). Construction

It is undisputed that LBI constructed the fill slope without a full set of engineered construction plans and specifications. Lang testified that, because DRB had not provided LBI with other plans, he "assum[ed]" that LBI could rely on the cross sections to construct the slope. (Trial Tr. 969:3-5). Specifically, when asked about LBI's construction plan, he stated:

> This is probably my fault but it's an assumption that I made that we were using certain ones for the road; that the ones for road would apply to the lot fill.

Id. at 820:4-6. He admitted, however, that "[LBI] probably shouldn't have done the lots without having another set of specs and plans drawn up for this site." Id. at 820:20-21.

Minney, who was in charge of the placement of the fill at the site for LBI, testified that he did so at the direction of LBI's surveyor, Rick Adams. (Trial Tr. 649:19-22). Minney "imagine[d]" that Adams "had a plan to work from," although he never asked. Id. at 650:5-6, 650:20-21. When shown the cross sections at trial, Minney agreed that they contained "limited information" and did not provide "details of design and construction of th[e] fill slope." Id. at 669:24-25.

---

The contracts thus were valid and enforceable as a matter of law.

DAN RYAN BUILDERS, INC. v. CRYSTAL RIDGE DEV., ET AL     1:09CV161

MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW

In constructing the fill slope, LBI did little more than cut fill from Lots 19 through 25 and place it on Lots 1 through 7. It failed to construct a keyway, strip the natural soil, implement a drainage system, bench individual lifts, or appropriately compact the fill. Id. at 371:11-12; 371:16-18; 371:19-23; (Joint Exhibit 16).

**(e).** Experts

DRB called Richard A. Brashear, ("Brashear"), a licensed professional engineer, qualified to opine as to design, engineering, and construction of fill slopes and the cause of the landslide at Crystal Ridge. (Trial Tr. 313:4-12). In Brashear's opinion, the lack of drainage of subsurface water, installation of the fill, oversteeped slope faces, lack of a keyway, the absence of benching, failure to uniformly compact the fill material, and failure to uniformly remove organic material were all "material factors" in the slope failure behind Lots 2-7. Id. at 373:14 - 374:16. He acknowledged that the slope failure area was "already marginally stable slope," particularly given the colluvial soils, but confirmed that LBI's poor engineering and construction practices were nevertheless "material factors" in its actual failure. Id. at 373:14 - 374:16. Indeed, he stated that building a

77

DAN RYAN BUILDERS, INC. v. CRYSTAL RIDGE DEV., ET AL     1:09CV161

MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW

fill slope without engineering designs on this particular site "would be foolish." Id. 370:10-15. He testified that he was "absolutely" confident that, with proper construction techniques, a secure fill slope could have been created from the start. Id. at 382:6, 381:18-20.

DRB also called Dr. Richard A. Bragg ("Bragg"), a civil engineer, qualified to opine as to engineering and failure analysis of fill slopes and construction of fill slopes. Id. at 431:16-23. Bragg testified that "the failure surface [of the landslide] [wa]s . . . within the colluvium." Id. at 451:11-12. He further opined that "[t]he colluvium [was] a principal factor in determining that [the] landslide occurred," but that "[t]he principal cause[] of [the landslide was] the placement of  surcharge on that fill that caused it to start to move again." Id. at 486:5-8. He, too, acknowledged that the slope failure area was a "precarious area on which to build a fill slope" in the first place, but confirmed that it could  be safely done with "good design" and "good construction practices." Id. at 467:4-19. He further opined, to a reasonable degree of engineering certainty, that a developer intending to place fill on a slope is obligated to evaluate the subject hillside. Id. at 438:7, 519:19.

78

DAN RYAN BUILDERS, INC. v. CRYSTAL RIDGE DEV., ET AL    1:09CV161

MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW

LBI called Steven Conner, ("Connor"), a geotechnical engineer, qualified to opine as to design services for fill embankments, construction monitoring services for the construction of fill embankments, and engineering services for the evaluation of slope failures. Id. at 1080:11-17. He agreed with Bragg that "the failure surface [of the landslide] was at that colluvium rock interface." Id. at 1093:6-7. He opined that the primary cause of the landslide was "ground water seeping out of the hillside saturating the colluvial layer which lies upon a claystone rock" and the sheer weight of the fill itself. Id. at 1093:3 - 1094:7. Significantly, he testified that, in his opinion, the compaction of the fill, any organic material left within the fill, and the steepness of the slopes were not causes of the landslide. Id. at 1094:6-1100:18. He, too, agreed that "[m]easures could [have] be[en] done similar to what was done during the remediation" to construct a safe fill slope in the first instance. Id. at 1175:14-22.

### iv.  Conclusion

#### (a).  Duty

DRB's characterization of the legal duty owed in this case has been a moving target. In the negligence count of its First Amended Complaint, DRB contended that LBI (1) "fail[ed] to perform [the]

79

DAN RYAN BUILDERS, INC. v. CRYSTAL RIDGE DEV., ET AL    1:09CV161

MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW

'Development Obligations' [of the LPA] with reasonable care and to a standard accepted in the industry," and (2) "fail[ed] to perform the construction activities under the Trade Contract[.]" (Dkt. No. 35 at 9). The breach of contract count mirrors these allegations. Id. at 12-13. Mention of the Fill Slope Contract, however, is conspicuously absent from the First Amended Complaint.

Now, in its post-trial brief, DRB suggests several new sources of the requisite legal duty: (1) a vendor of real estate's duty to disclose material latent defects of which he is aware, as set forth in Thacker v. Tyree, 297 S.E.2d 885 (W. Va. 1982); (2) the duty of a building contractor "to advise the owner of soil defects that are known to him or by the exercise of reasonable care should have become known," as set forth in Gamble v. Main, 300 S.E.2d 110, 116 (W. Va. 1983); (3) the "implied warranty" that work undertaken pursuant to a contract "shall be of proper workmanship and reasonable fitness for its intended use," also from Thacker; and (4) LBI's alleged breach of the City of Bridgeport's Design and Construction Standards Code ("Bridgeport Code") § 6.00(c), which requires a "preliminary soils review" as part of any preliminary subdivision plan submission. (Dkt. No. 256 at 55-59).

80

DAN RYAN BUILDERS, INC. v. CRYSTAL RIDGE DEV., ET AL    1:09CV161

MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW

DRB, however, specifically argues that LBI's poor construction practices, independent of any duty to disclose soil defects, caused the slope failure on Lots 2 through 7. Id. at 62. The Court agrees.[44] Consequently, then, only the third of DRB's suggested duties - the implied warranty that a person undertaking particular work will exercise the degree of skill equal to the undertaking - is relevant to DRB's damages with respect to the slope failure behind Lots 2 through 7. It is here that the problem arises.

The duty identified by DRB is a duty arising in contract, not an independent, positive duty arising from "the larger social policies embodied by the law of torts." Gaddy, 746 S.E.2d at 577 (quoting Goldstein v. Elk Lighting, Inc., No. 3:12-CV-168, 2013 WL 790765 at *3 (M.D. Pa. 2013)). As the West Virginia Supreme Court of Appeals explained in Thacker:

---

[44] The experts all agreed that LBI did not employ the standard construction practices that, if applied in the first instance, would have ensured the slope's stability. LBI did not install a keyway, employ benching, properly compact the fill, or install an appropriate drainage system. (Trial Tr. 326, 371:6). It simply did not take any reasonable measures to ensure the stability of the slope. The credible evidence further establishes that, but for LBI's shoddy construction practices, the landslide behind Lots 2-7 would not have occurred. In short, after a careful evaluation of the evidence of record, the Court concludes that LBI's poor construction practices were the sole proximate cause of the slope failure on Lots 2 through 7.

81

DAN RYAN BUILDERS, INC. v. CRYSTAL RIDGE DEV., ET AL     1:09CV161

MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW

> In building and construction <u>contracts</u> it is implied that the building shall be erected in a reasonably good and workmanlike manner and when completed shall be reasonably fit for the intended purpose. Ordinarily a person undertaking a particular work impliedly agrees to exercise a degree of skill equal to the undertaking. So, in case a person holds himself out as specially qualified to perform work of a particular character there is an <u>implied warranty that the work which he undertakes shall be of proper workmanship and reasonable fitness for its intended use.</u>

297 S.E.2d at 887 (emphasis added) (citation omitted). Inasmuch as a plaintiff "cannot maintain an action in tort for an alleged breach of contractual duty," even an implied contractual duty, <u>Thacker</u> offers DRB no quarter. <u>Lockhart</u>, 567 S.E.2d at 624.

Indeed, DRB has wholly failed to identify any "positive legal duty imposed by law" upon which its negligence claim could rest. <u>Id.</u> at 614. Under the Fill Slope Contract, LBI agreed to provide the fill necessary to deliver finished buildable lots, perform compaction testing, and bear responsibility for "quality control measures" for the fill behind Lots 1-9 and 19-26. (J. Ex. 4 at 1). Unquestionably, it failed to live up to its contractual obligations, and DRB suffered damages as a result.[45] It is plain,

---

[45] The Court has also examined the <u>Sewell</u> case in search of a legal duty. Syl. Pt. 3, <u>Sewell</u>, 371 S.E.2d 82 ("A builder is under a common law duty to exercise reasonable care and skill in the

DAN RYAN BUILDERS, INC. v. CRYSTAL RIDGE DEV., ET AL     1:09CV161

MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW

however, that "the alleged duties breached [are] grounded in the contract itself." Gaddy, 746 S.E.2d at 577 (citation omitted). DRB itself argues as much.

The distinct differences between tort and contract actions reveal the need to apply the gist of the action doctrine to this case.   For instance, tort actions lie for breaches of duties imposed by social policy, whereas contract actions lie for breaches of duties imposed by consensual agreements made by two or more parties. Steel v. W. Va., Inc. v. AMI G.E., LLC, No. 3:09-0005, 2009 WL 1648915, at *2 (S.D. W. Va. June 10, 2009).  As this Court has previously noted, "[t]he parties involved in a construction contract resort to contracts and contract law to protect their economic expectation.   Their respective rights and duties are defined by the various contracts they enter." National Steel Erection, Inc. v. J.A. Jones Const. Co., 899 F.Supp 268, 274 (N.D. W. Va. 1995) (quoting Blake Constr. Co., Inc. v. Alley, 353 S.E.2d 724 (Va. 1987)).  Thus, to allow recovery in tort in this instance

---

construction of a building and a subsequent homeowner can maintain
an action against a builder for negligence resulting in latent
defects which the subsequent purchaser was unable to discover prior
to purchase."). In that case, however, the Supreme Court of Appeals
established the duty of a builder to a third-party homeowner, one
who was not in contractual privity with the builder.

DAN RYAN BUILDERS, INC. v. CRYSTAL RIDGE DEV., ET AL    1:09CV161

MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW

would disrupt the well founded expectations the parties held upon entering their contract.

Furthermore, "tort law is not designed . . . to compensate parties for losses suffered as a result of a breach of duties assumed only by agreement." Silk v. Flat Top Const., Inc., 453 S.E.2d 356, 360 (W. Va. 1994). "In tort actions, damages are awarded to compensate the plaintiff for all loss suffered by breach of the duty, whereas in contract actions, damages are limited by the scope of the agreement and must be foreseeable at the time the agreement is made." Iron Mountain, 457 F.Supp at 1165.

These, along with other differences, have characterized breaches of contract and tort claims as wholly separate causes of action. Thus, "to permit a promisee to sue his promissor in tort for breaches of contract inter se would erode the usual rules of contractual recovery and inject confusion into our well-settled forms of actions." Glazer v. Chandler, 414 P.A. 304, 309 (1964); see also Silk, 453 S.E. 2d at 356. Applying the gist of the action doctrine in the present action prevents this outcome from occurring.

84

DAN RYAN BUILDERS, INC. v. CRYSTAL RIDGE DEV., ET AL    1:09CV161

MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW

b.    Slope Failure Behind Lots 15-17

DRB alleges that LBI's negligent construction practices proximately caused the "surface slump" on Lots 15 through 17 in April, 2008. (Dkt. No. 256 at 44). As a result, it claims to have suffered $83,062.73 in damages. Id. Notwithstanding the fact that this claim suffers from the same gist-of-the-action deficiencies discussed above, the Court finds that this claim fails for the separate and independent reason that DRB simply offered no proof of LBI's liability.

The Court expressed concern at trial that no evidence had been presented regarding the slope failure with respect to lots other than Lots 2-7. (Trial Tr. at 1637:4-5). Now, following a thorough review of the evidentiary record, it remains wholly unsatisfied. Both Brashear and Bragg specifically limited their expert opinions on the cause of the slope failure to Lots 2-7. Id. at 418:17; 472:3.[46] Indeed, in its post-trial brief, DRB cites no testimony in

_____

[46] Both Brashear and Bragg testified that the slope failure present on Lots 2-7 was actually geologically contained to those lots. Brashear stated that "there was a rock shelf that was present at a higher elevation so there wasn't the same depth of soil on lot eight so the slide could not extend any further past lot seven," and that "similar circumstances were present on lot one where the rock [. . .] wasn't as prone to slide," and as such, "the limit of the slide where it was on lot two was about as far as it could extend." (Trial Tr. 418:2-17). The affected lots, consequently,

DAN RYAN BUILDERS, INC. v. CRYSTAL RIDGE DEV., ET AL     1:09CV161

MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW

support of its claims for damages involving Lots 15-17. It points instead to a single report issued by PSR, a document limited by its terms to Lots 15 and 16, stating only that the "slump" on these lots was caused by "ground water and possibly a component of surface water from an adjacent diversion channel." (Pl. Ex. 11 at 1).[47] This report sheds no light on LBI's supposed responsibility for the same.

Given that DRB has failed to produce any evidence with respect to the slope failure behind Lots 15 - 17, the Court denies this claim.

c.   **Compaction Issues**

DRB contends that LBI's negligent construction practices proximately caused "the compaction issues on Lot 3, and the necessity for foundation recommendations on several other lots." (Dkt. No. 256 at 66-67). This claim, too, has its origin in the

---

were "[t]wo through seven." *Id.* at 418:17. Similarly, Bragg testified that "the geologic conditions . . . in the vicinity of lot one were not such that a landslide developed there because of differences in geologic conditions, so specifically, the landslide extends roughly from lots two to seven and that's what I've been addressing." (Trial Tr. 471:20-25).

[47] The Court notes that this exhibit was admitted through the testimony of Rusch on the premise that Brashear would eventually testify as to its contents. (Trial Tr. 141:20-21). Brashear, however, never addressed this exhibit.

DAN RYAN BUILDERS, INC. v. CRYSTAL RIDGE DEV., ET AL    1:09CV161

MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW

Fill Slope Contract, and not "the larger social policies embodied by the law of torts." Gaddy, 746 S.E.2d at 577 (quoting Goldstein, 2013 WL 790765, at *3). LBI plainly breached the provision of the Fill Slope Contract that required it to perform "compaction testing" and, according to CTL, installed fill behind Lot 3 that was "very loose or very soft" and necessitated remediation. (Trial Tr. 540:9-18); (HBE Ex. 24). The gist of this action is the breach of the Fill Slope Contract. Consequently, DRB cannot recover.

### d. Lot 10 issues

DRB claims that it suffered $17,868.89 in damages as a result of "bad soil" on Lot 10, which it attributes to LBI's negligence in failing to disclose soil defects. (Dkt. No. 256 at 42). This claim, too, fails for lack of proof.

### i.  Facts

On April 9, 2007, Fred Burton, a building inspector from the City of Bridgeport, conducted an announced inspection of Crystal Ridge. (Trial Tr. 1319:1-7). At that time, he observed "a seam of white clay" in the excavation site for the foundation on Lot 10. Id. at 1311:12-14. According to Burton, white clay is an "unstable fill" that can cause soil movement. Id. at 1311:17-23. He explained that white clay does not reflect on the quality or appropriateness

87

DAN RYAN BUILDERS, INC. v. CRYSTAL RIDGE DEV., ET AL    1:09CV161

MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW

of the fill, id. at 1314:15:-2, and he could not testify as to whether the clay at issue was a part of the original ground or fill. Id. at 1323:3-7. He agreed with counsel for DRB that white clay is simply "a natural condition that crops up every once in a while." Id. at 1314:10-11.

Burton required DRB to stop work until an engineer provided a recommendation to the City. Id. at 1320:3-14. DRB then retained CTL to design a special foundation for the home to be constructed on Lot 10. Id. at 222:4-5. CTL, in accordance with the City's instructions, "widen[ed] the footer" and made it "thicker than normal[.]" Id. at 1312:17-18. On April 11, 2007, two days after the shutdown, CTL sent the City the documentation necessary for DRB to resume work. Id. at 1320:22 - 1322:22.

ii. **Conclusion**

DRB summarily concludes that LBI's "failure to disclose adverse soil conditions and failure to obtain a geotechnical investigation operated concurrently to proximately cause the issues on Lot 10." (Dkt. No. 256 at 10, 69). At trial, however, it presented no evidence with respect to white clay. Thus, the Court has no basis from which to determine whether the clay was known to LBI or whether it is even something that would ordinarily be found

88

DAN RYAN BUILDERS, INC. v. CRYSTAL RIDGE DEV., ET AL    1:09CV161

**MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW**

by a geotechnical investigation. Without more, the Court finds no reason to hold LBI liable for "a natural condition that crops up every once in a while." Id. at 1314:10-11. DRB thus has failed to carry its burden as to any claim sounding in negligence against LBI; LBI's contribution claim against HBE is therefore moot.[48]

### E. CONTRIBUTION - Horner Brothers Engineering

LBI asserts that HBE is liable for DRB's damages by way of contribution. This is a derivative liability claim. Kodym v. Frazier, 412 S.E.2d 219, 223 (W. Va. 1991). Consequently, as the Court has found that DRB has failed to prove any damages sounding in negligence, it is moot.

### IV. CONCLUSION

For the reasons discussed, the Court **CONCLUDES** as a matter of law:

1.    **DEFENDANT LANG BROTHERS, INC.** breached paragraph 10 of the First Amendment to the LPA, as a consequence of which it is liable to **PLAINTIFF DAN RYAN BUILDERS, INC.** in the amount of $**175,646.25;**

---

[48] The Court notes that, as it has found the DRB has asserted no viable negligence action against LBI, it need not address DRB's claim that Lang should be personally liable for the acts of his company.

DAN RYAN BUILDERS, INC. v. CRYSTAL RIDGE DEV., ET AL     1:09CV161

MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW

2.  **DEFENDANT LANG BROTHERS, INC.** owes pre-judgment interest to **PLAINTIFF DAN RYAN BUILDERS, INC.** in the amount of **$77,575.50**;

3.  **DEFENDANT LANG BROTHERS, INC.** is not liable in negligence to the **PLAINTIFF DAN RYAN BUILDERS, INC.**;

4.  **DEFENDANT LANG BROTHERS, INC'S** claim in contribution against **THIRD PARTY DEFENDANT HORNOR BROTHERS ENGINEERS** is **DENIED AS MOOT**; and

5.  **DEFENDANT LANG BROTHERS, INC.** is liable to **PLAINTIFF DAN RYAN BUILDERS, INC.** for the total sum of **$253,221.75**.

It is so **ORDERED**.

The Court **DIRECTS** the Clerk to enter a separate judgment order in favor of the **PLAINTIFF DAN RYAN BUILDERS, INC.** against **DEFENDANT LANG BROTHERS, INC.** in  accordance with this Memorandum Opinion and Order and **DISMISSES** this case **WITH PREJUDICE**. The Clerk is further directed to transmit copies of this Memorandum Opinion and Order and the separate judgment order to counsel of record.

DATED: September 24, 2013

/s/ Irene M. Keeley
IRENE M. KEELEY
UNITED STATES DISTRICT JUDGE